Craig A. Wolfe
Jason R. Alderson
T. Charlie Liu
David K. Shim
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Telephone: (212) 309-6000
Facsimile:  (212) 309-6001
craig.wolfe@morganlewis.com
jason.alderson@morganlewis.com
charlie.liu@morganlewis.com
david.shim@morganlewis.com

*Proposed Counsel for Debtor and Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>SOLSTICE MARKETING CONCEPTS LLC,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 21-10306 (MG) |

### DECLARATION OF JACEN A. DINOFF IN SUPPORT OF THE DEBTOR'S CHAPTER 11 PETITION, FIRST DAY MOTIONS AND RELATED FILINGS

I, Jacen A. Dinoff, hereby declare under penalty:

1. I am the Chief Restructuring Officer of Solstice Marketing Concepts LLC (the "Debtor"). On February 17, 2021 (the "Petition Date"), the Debtor filed a voluntary petition (the "Chapter 11 Petition") under subchapter V of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") commencing this case (the "Chapter 11 Case") in the United States Bankruptcy Court for the Southern District of New York.  I am also the Chief Executive Officer

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is: Solstice Marketing Concepts LLC (4579).

of KCP Advisory Group ("KCP"), which has an office located at 700 Technology Park Drive, Suite 212, Billerica, MA 01821.

2. I am authorized to submit this declaration (the "Declaration") on behalf of the Debtor. This Declaration is made pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "Local Rules") in support of the Chapter 11 Petition and each of the motions and applications for relief filed contemporaneously with the Chapter 11 Petition (collectively, "First Day Pleadings").

3. Except as otherwise indicated, all statements set forth in this Declaration are based upon: (a) my personal knowledge; (b) information supplied to me by other members of the Debtor's management or its professionals, which I believe in good faith to be reliable; (c) my review of relevant documents; or (d) my opinion based upon my experience and knowledge of the Debtor's operations and financial condition.

4. I submit this Declaration to provide the Court and other parties in interest with an overview of the Debtor's business and to describe the circumstances compelling the commencement of this Chapter 11 Case. I also submit this Declaration in support of the First Day Pleadings filed by the Debtor shortly after the Petition Date, by which the Debtor seeks relief necessary for it to operate as a going concern, maximize the value of the estate, and address the significant challenges presented by the ongoing COVID-19 pandemic on its retail operations.

5. Local Rule 1007-2 requires certain information related to the Debtor, much of which is set forth below, in **Exhibit A**, or in documents filed concurrently herewith. The balance of the information requested will be included in the Debtor's Schedules and Statement of Financial Affairs, which Debtor expects to file within the 14 days permitted by the Bankruptcy Code. Unless

otherwise indicated, the financial information below is unaudited. The Debtor believes the information provided or to be provided in the Schedules and Statement of Financial Affairs satisfies the requirements of Local Rule 1007-2.

## NATURE OF DEBTOR'S BUSINESS

**I.    Debtor's Organizational Structure**

6.     The Debtor, a Delaware limited liability company, is a brick and mortar and online retailer of designer, contemporary and sport sunglasses for women, men and children, operating under the brand name Solstice Sunglasses (www.solsticesunglasses.com).

7.     The Debtor is currently owned and operated by Fairway, LLC as the sole manager ("Fairway"). Prior to July 2019, the Debtor was part of the Safilo Group, a large Italian-based group of affiliated companies focused on the design, manufacture, and distribution of sunglasses, sports eyewear, and optical frames in key markets across the globe ("Safilo"). In the North American market, Safilo developed a business relationship with G.S.I. Corporation ("GSI"), a wholesale optical frame and sunglass trader. Believing that the Debtor's retail business was a logical fit for GSI's wholesale business, an officer of GSI entered into negotiations with Safilo for the acquisition of the Debtor. These discussions culminated when, on or about July 1, 2019, Fairway (an entity affiliated with GSI) purchased all of the membership interests of the Debtor from Solstice Marketing Corporation, which was an intermediate holding company in the broader Safilo organization, including Safilo America, Inc.

8.     The Debtor's organizational chart is attached hereto as **Exhibit B**.

**II.   The Retail Business**

9.     As of the Petition Date, the Debtor has 66 retail stores and approximately 95 full-time, 115 part-time employees, which ranks as one of the largest luxury sunglass retail chains in the United States. The Debtor's retail footprint primarily spans the so-called "sun smile" of the

United States, with locations in Hawaii, California, Nevada, Arizona, Texas, Louisiana, Mississippi, Georgia, Florida, North Carolina, Virginia, Pennsylvania, New Jersey, New York, New Hampshire, Michigan, and Illinois. Approximately 80% of the Debtor's sales are generated by stores concentrated in Hawaii, California, Texas, Florida, and New York.

10. The retail business is organized into three interrelated segments. The first consists of 38 boutique (generally full-price) stores located in premier malls or on prime street locations, and average 960 sq. ft. in size (per store). Prior to the pandemic, the boutique locations accounted for approximately 44% of overall net sales.

11. The second segment consists of 28 outlet stores located in a mix of high-end and contemporary malls, and average a little over 1,150 sq. ft in size (per store). The outlet segment sells a combination of marked down and full priced products, with a sizable portion of foot-traffic generated by tourists. Prior to the pandemic, the outlet segment, albeit with a smaller store count, generated approximately 54% of overall net sales.

12. The Debtor's third and increasingly critical channel of business is website and mobile platforms. The Debtor's online presence seeks to drive traffic to physical stores, increase sales, and bring overall brand awareness. Prior to the pandemic, the ecommerce segment represented approximately 2% of overall net sales.

### III. Prepetition Capital Structure

13. Fairway holds all of the equity of the Debtor, which has no secured indebtedness held by unaffiliated third parties. The Debtor does, however, have secured debt owing to GSI, which as noted above, is another of the Debtor's affiliates. Such debt arose from the Debtor's purchases of inventory and other cash borrowings. GSI recorded a UCC-1 on all assets of the Debtor (the "GSI Loan"). As of the Petition Date, the GSI Loan is outstanding in the amount of $875,000.

14. Further, as of the Petition Date, the total amount of past-due rent owed by the Debtor to various landlords is approximately $4,542,615, and the total amount owed to trade vendors and/or on account of other unsecured obligations is approximately $2,716,576, for total unsecured indebtedness of approximately $7.259 million. The Debtor's assets at book value are approximately $11 million, but the estimated orderly liquidation value is less than $10 million.

### EVENTS LEADING TO DEBTOR'S FILING FOR CHAPTER 11 RELIEF

15. Many sectors of the retail industry have been buffeted in recent years with significant challenges, such as fundamental shifts in customer behavior, an increasingly saturated and highly competitive market coupled with rising operational costs, and numerous new product channels often offering much lower price points. Such upheaval impacted the Debtor's business along with many of its competitors in the form of decreased foot traffic—the lifeblood of physical stores—and significant downward pressure on net sales.

16. To address a shifting marketplace, in the fall of 2019 and early 2020, the Debtor focused on key initiatives designed to increase traffic and sales that included, without limitation, (i) revising the Debtor's marketing strategy; (ii) leveraging growth opportunities and expanding omnichannel development, such as enhancing the Debtor's website experience, "buy online and pick up in store" programs, targeted communications, digital marketing, and traffic generation via customer database and outreach; (iii) taking steps to reconcile and close underperforming physical locations, coupled with re-negotiating lease costs for certain remaining locations; and (iv) considering new store openings in selective locations with attractive sale metrics.

17. The Debtor's initiatives were barely underway when everything changed with the onset of the COVID-19 pandemic. For much of 2020 and now continuing into 2021, the pandemic has rippled across the country impacting the lives of millions of Americans and thousands of

5

businesses. For the Debtor business has essentially collapsed. The multiple rounds of various state "stay at home" orders and mandated store closures, coupled with vanishing tourist foot traffic and/or discretionary spending, have collectively caused the Debtor's net sales to sharply decline 57.7% measured on a same store year over year basis on December 31, 2020 for the twelve months ended.

18. During this same period, with retail operations at a stand-still, the Debtor considered stop-gap measures to buy limited time to evaluate remaining strategic alternatives. This included repeated efforts in 2020 to boost liquidity through possible third-party financing. And in the face of mounting rent obligations, the Debtor engaged with landlords to explore possible abatements, concessions and improved lease terms for all of its retail locations to help bridge the crisis. Although landlord outreach met with some success, with financing efforts coming up short the Debtor was nonetheless forced to stop paying rent for most store locations for approximately 10 months in 2020. Today, most of the Debtor's unsecured indebtedness consists of deferred or outstanding rent owed to various landlords, and there is little in the way of relief in sight. The Debtor is now simply out of time based on remaining liquidity and internal cash burn projections.

19. The Debtor's decision to seek immediate relief is also due to an accelerating paradigm shift in the marketplace to ecommerce due to the ongoing pandemic. The Debtor is currently saddled with an increasing number of underperforming stores that in all probability will not return to pre-pandemic revenue levels in the foreseeable future (if ever). The Debtor's targeted customers are rapidly shifting to online channels with the broader industry as their first and likely last stop, and if the Debtor is to survive it too must go where its customers are. This means renewed focus and investment in the Debtor's ecommerce initiatives. But to get there the Debtor must

reconcile its existing retail footprint with the marketplace and focus only on those stores that fit in the Debtor's reorganized, multi-channel structure.

20. I believe that timing is also dictated by two other material factors, namely the Debtor was able to obtain up to $6.5 million in proposed postpetition financing ("DIP Financing") from Second Avenue Capital Partners LLC ("Second Avenue"), and the benefits offered by the Subchapter V statutory scheme. First, as to DIP Financing, the Debtor first began exploring various strategic alternatives that included third-party financing even before the pandemic hit with full force in March 2020. As the pandemic took hold, the Debtor's efforts accelerated at a frenetic pace as dozens of lenders were contacted, yet sustained interest in the marketplace was extremely difficult to generate in the face of the Debtor's rapidly declining sales and the overall carnage experienced up and down the retail sector this past year.

21. But beginning in and around December 2020, the Debtor entered into protracted discussions with Second Avenue over the terms of a financing package to fund the instant Chapter 11 Case. As these negotiations progressed, and given that the management of the Debtor had spent numerous months of on and off against discussions with various other lenders and I had researched other non-bank finance options, it soon became abundantly clear to me and the Debtor's other advisors that the Debtor would not be able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than the proposed DIP Financing package offered by Second Avenue. Accordingly, I firmly believe that with the DIP Facility, the Debtor is armed with sufficient financing to (i) to stabilize its business and preserve the value of its assets; (ii) to satisfy payroll obligations and other near-term working capital requirements; (iii) administer the Chapter 11 Case;

and (iv) prepare and file a Chapter 11 plan of reorganization that, if confirmed, will maximize distributions for the Debtor's unsecured creditors under Subchapter V of Chapter 11.

22. I also believe with equal force that the Debtor is out of time if the proposed DIP Financing is not approved. The Debtor no longer generates sufficient revenue to maintain its present business, and therefore faces immediate liquidation if the present strategy coupled with financing is not pursued. The consequence of failure is stark: if forced to liquidate, the Debtor's employees face immediate termination, all of the leases and contracts will be rejected, and the Debtor's creditors will likely obtain little or if any recovery through the liquidation of existing inventory. The Debtor seeks to avoid this outcome as discussed herein, and the requested financing represents a linchpin to seeing it through.

23. The other essential component to the Debtor's strategy is the Subchapter V program. Under the new scheme enacted on February 19, 2020, Congress increased the eligibility ceiling for total indebtedness held by a struggling business seeking to file for Chapter 11 under Subchapter V from approximately $2.725 million to $7.5 million. The new scheme is slated to expire on March 27, 2021. The Debtor currently qualifies for Subchapter V and all hope of rehabilitation hinges on its fast and efficient provisions. Further delay, however, introduces prohibitive risk as accumulating indebtedness may cause the Debtor to exceed the expanded debt ceiling, or the entire program may expire if not renewed. Regardless of the scenario, the inability to leverage the provisions offered by Subchapter V would most likely—standing alone—result in the immediate liquidation of the Debtor's enterprise.

24. Based on the above and my experience, and in consultation with Debtor and its advisors, I concluded it was necessary for the Debtor to file for Chapter 11 and pursue a "right sizing" strategy armed with the requested DIP Financing that will entail critical adjustments to its

lease portfolio, and a reorganization around retail stores designed to benefit Debtor's overall business position and ecommerce operations.

## GOALS OF THE BANKRUPTCY

25.     The Debtor commenced this Chapter 11 Case to preserve the value of its assets and right size its retail footprint as a complement to its ongoing ecommerce initiatives, and in the process maximize the Debtor's going concern value for the benefit of the estate and creditors.

26.     The Debtor looks forward to working closely with the Subchapter V trustee and creditors to propose a Chapter 11 plan as soon as possible that will harness the value of the Debtor's rebalanced operations over three to five years as required under the Bankruptcy Code.

## FIRST DAY PLEADINGS

27.     Concurrent with the filing of this Declaration, the Debtor filed a number of first day motions seeking relief which the Debtor believes is necessary to avoid irreparable harm in the early days of this case; enable the Debtor to efficiently administer its estate with minimal disruption and loss of value during this Chapter 11 Case; and ensure the best outcome for the Debtor, its estate, and its creditors.

28.     The First Day Pleadings are comprised of the following motions:

(i)     *Debtor's Motion for Entry of an Order (I) Authorizing Debtor to (A) Maintain its Existing Insurance Policies, and (B) Pay Certain Prepetition Insurance Premiums; and (II) Granting Related Relief* [Dkt. No. 7].

(ii)    *Debtor's Motion for Entry of an Order (I) Authorizing, But Not Directing, the Payment of Certain Prepetition Taxes and Fees, and (II) Granting Related Relief* [Dkt. No. 8].

(iii)   *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Honor Certain Prepetition Customer Program Obligations, and (II) Granting Related Relief* [Dkt. No. 9].

(iv) *Debtor's Motion for Entry of an Order (I) Authorizing Debtor to (A) Pay Prepetition Wages, Salaries, Reimbursable Expenses, and Other Employee Compensation, and (B) Honor Certain Employee Benefits and Other Associated Obligations; and (II) Granting Related Relief* [Dkt. No. 10].

(v) *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Continue to Use Existing Cash Management System with Certain Modifications, and (II) Granting Related Relief* [Dkt. No. 11].

(vi) *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Obligations to Critical Vendors, and (II) Granting Related Relief* [Dkt. No. 14].

(vii) *Debtor's Motion for Entry of Interim and Final Orders to (A) Obtain Postpetition Financing; and (B) Grant Related Relief.*

29. I have reviewed and am familiar with the content of each of the First Day Pleadings. The First Day Pleadings seek authority to, among other things, honor employee-related wages and benefits obligations, ensure the continuation of the Debtors' cash management systems, customer programs, and other business operations without interruption, and as discussed above at length, obtain necessary DIP Financing. I believe that the relief requested in the First Day Pleadings is necessary to provide the Debtor an opportunity to work toward a successful resolution of this Chapter 11 Case—with minimal disruption to the Debtor's retail operations—that will benefit all of the Debtor's stakeholders.

30. Several of the First Day Pleadings request authority to pay certain prepetition claims. I understand that Bankruptcy Rule 6003 provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. P. 6003. In light of this requirement, the Debtor has narrowly tailored its request for immediate authority to pay certain prepetition claims in those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtor and its estate. Other relief will be deferred for consideration at a later hearing.

31.     I am familiar with the content and substance of the First Day Pleadings. Based on my knowledge, after reasonable inquiry, I believe approval of the relief sought therein (a) is necessary to enable the Debtor to transition into, and operate efficiently and successfully in, Chapter 11 with minimal disruption or loss of productivity and value, (b) is critical to the Debtor achieving a successful restructuring under Subchapter V, and (c) is in the best interest of the Debtor's estate and its stakeholders. I believe the relief requested therein is necessary to allow the Debtor to operate with minimal disruption while this Chapter 11 Case is pending and to preserve the value of its assets and operations for the benefit of its stakeholders in accordance with the Bankruptcy Code (including Subchapter V).

[*Remainder of page intentionally left blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated: February 23, 2021

/s/ *Jacen A. Dinoff*
Jacen A. Dinoff
Chief Restructuring Officer
Solstice Marketing Concepts LLC

**EXHIBIT A**

**Local Rule 1007-2(a)(1)** (*the nature of the debtor's business and a concise statement of the circumstances leading to the debtor's filing under chapter 11*).

Response: Contained in this Declaration.

**Local Rule 1007–2(a)(2)** (*if the case originally was commenced under chapter 7 or chapter 13, the name and address of any trustee appointed in the case and, in a case originally commenced under chapter 7, the names and addresses of the members of any creditors' committee*).

Response: Not applicable.

**Local Rule 1007–2(a)(3)** (*the names and addresses of the members of, and attorneys for, any committee organized prior to the order for relief in the chapter 11 case, and a brief description of the circumstances surrounding the formation of the committee and the date of its formation*):

Response: Not applicable.

**Local Rule 1007–2(a)(4)** (*the following information with respect to each of the holders of the twenty (20) largest unsecured claims, excluding insiders: the name, the address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the telephone number, e-mail address, the name(s) of person(s) familiar with the debtor's account, the amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed or partially secured*).

Response: Contained in the Chapter 11 Petition.

**Local Rule 1007–2(a)(5)** (*the following information with respect to each of the holders of the five (5) largest secured claims: the name, the address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), the amount of the claim, a brief description and an estimate of the value of the collateral securing the claim, and whether the claim or lien is disputed*).

Response: G.S.I. Corp., 40 Bayview Avenue, Inwood, New York 11906. The balance of the GSI Loan is $875,000, and the collateral securing the loan is all-assets of the Debtor. The Debtor's collateral value (at book value) is an estimated $11 million. Orderly liquidation value is less than $10 million. The GSI claim and liens are undisputed, but remain subject to review.

**Local Rule 1007–2(a)(6)** (*summary of the debtor's assets and liabilities*):

Response: A summary of the Debtor's assets and liabilities is contained within this Declaration.

**Local Rule 1007–2(a)(7)** (*the number and classes of shares of stock, debentures or other securities of the debtor that are publicly held, and the number of holders thereof, listing separately those held by each of the debtor's officers and directors and the amounts so held*).

Response:  Addressed in the body of this Declaration.

**Local Rule 1007–2(a)(8)** (*a list of all of the debtor's property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents or secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the court in which any proceeding relating thereto is pending*).

Response:  As of the filing of this Declaration, the Debtor believes the only property it has in the possession or custody of others is comprised of security deposits with certain utilities, landlords and service providers as set forth in the following list. An accurate list of Debtor's property in possession of others as of the Petition Date is being prepared and, to the extent applicable, will be filed with Debtor's Schedules and Statement of Financial Affairs.

| Category | Vendor | Security Deposit |
|---|---|---|
| Utility Deposit | Florida Power (S/B Progress Energy) | 1,000.00 |
| Utility Deposit | Florida Power | 415.00 |
| Utility Deposit | CON EDISON | 590.00 |
| Utility Deposit | Progress Energy | 285.12 |
| Utility Deposit | Entergy | 900.00 |
| Utility Deposit | Entergy | 437.00 |
| Utility Deposit | CITY OF PALO ALTO UTILITIES | 1,000.00 |
| Utility Deposit | Orlando Utilities Comm | 450.00 |
| Utility Deposit | SOUTH WALTON UTILITY CO INC | 125.00 |
| Utility Deposit | GULF POWER | 750.00 |
| Utility Deposit | NV ENERGY | 549.00 |
| Utility Deposit | CON EDISON | 865.00 |
| Utility Deposit | Duke Energy | 320.00 |
| Lease Security Deposit | I&G Direct Real Estate | 7,758.33 |
| Lease Security Deposit | Waller Realty | 46,000.00 |
| Lease Security Deposit | Waller Realty | 74,834.00 |
| Lease Security Deposit | Westfield Concession Mngt | 25,000.00 |
| Lease Security Deposit | 801 Washington LLC | 34,132.00 |
| Lease Security Deposit | 500 Fifth Avenue | 37,578.57 |
| Music Provider for Stores | DMX Music Service Agreement | 4,500.00 |
| Retainer-Landlord Negotiation | Retail Consulting Service | 50,000.00 |
| For all Nevada Stores | Nevada Business Lic Fee | 10,520.31 |
| | | **Total: $298,009.33** |

**Local Rule 1007–2(a)(9)** (*a list of the premises owned, leased or held under other arrangement from which the debtor operates its business*).

Response:  The Debtor leases non-residential real property at the following locations:

| Store # | Property | Address | | | |
|---|---|---|---|---|---|
| 1017 | Paseo Nuevo | 713 Paseo Nuevo | Santa Barbara | CA | 93101 |
| 1005 | Glendale Galleria | 2157 Glendale Galleria, Suite CU04 | Glendale | CA | 91210 |

2

| 1047 | Baybrook Mall | 1354 Baybrook Mall | Friendswood | TX | 77546 |
|---|---|---|---|---|---|
| 1066 | The Mall of Louisiana | 6401 Bluebonnet Blvd., Space 1044 | Baton Rouge | LA | 70836 |
| 1095 | Staten Island Mall | 2655 Richmond Ave., Space 2334 | Staten Island | NY | 10314 |
| 1035 | The Shops at Columbus Circle | 10 Columbus Circle, Space 306 | New York | NY | 10019 |
| 1092 | Miracle Mile Shops | 3663 Las Vegas Blvd. South, Suite 495 | Las Vegas | NV | 89109 |
| 1082 | The Galleria at Ft. Lauderdale | 2482 E. Sunrise Blvd. | Fort Lauderdale | FL | 33304 |
| 2634 | Outlets of Maui | 900 Front Street, H-3 | Lahaina | HI | 96761 |
| 1006 | Tysons Corner Center | 1961 Chain Bridge Road, Space G17L | McLean | VA | 22102 |
| 1014 | The Village at Corte Madera | 1732 Redwood Highway | Corte Madera | CA | 94925 |
| 1134 | Kierland Commons | 15034 North Scottsdale Road, Suite 105 | Scottsdale | AZ | 85254 |
| 1138 | Santa Monica Place | 395 Santa Monica Place, Suite 205W | Santa Monica | CA | 90401 |
| 1139 | Queens Center | 90-15 Queens Boulevard, Space 5040 | Elmhurst | NY | 11373 |
| 1145 | Broadway Plaza | 1275 Broadway Plaza Space #1032 | Walnut Creek | CA | 94596 |
| 2619 | Fashion Outlets of Niagara Falls | 1864 Military Road, Space 35 | Niagara Falls | NY | 14304 |
| 2628 | Fashion Outlets of Chicago | 5220 Fashion Outlets Way, Suite 1230 | Rosemont | IL | 60018 |
| 1074 | The Shops at Canal Place | 333 Canal Street, Suite 218 | New Orleans | LA | 70130 |
| 2602 | San Marcos Premium Outlets | 3939 Interstate Hwy 35S, Suite 1025 | San Marcos | TX | 78666 |
| 2603 | Gilroy Premium Outlets | 681 Leavesley Rd., Suite 130 | Gilroy | CA | 95020 |
| 2604 | Woodbury Common | 431 Dune Road | Central Valley | NY | 10917 |
| 2605 | Las Vegas Premium Outlets | 785 South Grand Central Pkwy Suite 2109 | Las Vegas | NV | 89106 |
| 2606 | Houston Premium Outlets | 29300 Hempstead Road Suite 404 | Cypress | TX | 77433 |
| 2608 | Jersey Shore Premium Outlets | 1 Premium Outlet Blvd., Suite 739 | Tinton Falls | NJ | 7753 |
| 2611 | Philadelphia Premium Outlets | 18 Lightcap Road, Suite 1247 | Pottstown | PA | 19464 |
| 2616 | Camarillo Premium Outlets | 630 Ventura Blvd., Suite 1219 | Camarillo | CA | 93010 |
| 2617 | Carlsbad Premium Outlets | 5600 Paseo Del Norte, Suite A135 | Carlsbad | CA | 92008 |
| 2620 | Vacaville Premium Outlets | 340 Nut Tree Road | Vacaville | CA | 95687 |
| 2621 | Waikele Premium Outlets | 94-790 Lumiaina Street, Suite 302 | Waipahu | HI | 96797 |
| 2623 | Desert Hills Premium Outlets | 48400 Seminole Drive, Space 320 | Cabazon | CA | 92230 |
| 2626 | San Francisco Premium Outlets | 2774 Livermore Outlets Drive | Livermore | CA | 94551 |
| 2627 | Merrimack Premium Outlets | 80 Premium Outlets Blvd., Suite 687 | Merrimack | NH | 3054 |
| 2630 | Silver Sands Premium Outlet | 10562 Emerald Coast Pkwy W. Suite 115 | Destin | FL | 32550 |

3

| 1001 | The Florida Mall | 8001 South Orange Blossom Trail #132 | Orlando | FL | 32809 |
|---|---|---|---|---|---|
| 1002 | South Park Mall | 4400 Sharon Road #E14 | Charlotte | NC | 28211 |
| 1010 | Roosevelt Field Mall | 630 Old Country Road, 1084B | Garden City | NY | 11530 |
| 1015 | Town Center at Boca Raton | 6000 Glades Road #1045B | Boca Raton | FL | 33431 |
| 1029 | The Westchester Mall | 125 Westchester Avenue, Space # 3070 | White Plains | NY | 10601 |
| 1032 | Houston Galleria | 5135 West Alabama, Suite 7220 | Houston | TX | 77056 |
| 1038 | King of Prussia Mall | 160 North Gulph Road, Space # 1395 | King of Prussia | PA | 19406 |
| 1042 | St. John's Town Center | 4712 River City Drive, Suite 119 | Jacksonville | FL | 32246 |
| 1058 | Barton Creek Square | 2901 S. Capital of Texas Hwy, #E-6C | Austin | TX | 78746 |
| 1061 | Lenox Square Mall | 3393 Peachtree RD NE, Space 4038 | Atlanta | GA | 30326 |
| 1129 | Palo Alto | 180 El Camino Real Suite #1150 | Palo Alto | CA | 94304 |
| 1140 | Fashion Valley Mall | 7007 Friars Road Space #781 | San Diego | CA | 92108 |
| 2609 | Orlando Premium Outlets | 4953 International Drive, Suite 1A 17 | Orlando | FL | 32819 |
| 2610 | Rio Grande Valley | 5001 East Expressway 83, Suite 824 | Mercedes | TX | 78570 |
| 2618 | Sawgrass Mills Outlet | 12801 W. Sunrise Blvd., Space 442 | Sunrise | FL | 33323 |
| 2624 | Great Mall at Milpitas | 516 Great Mall Drive | Milpitas | CA | 95035 |
| 2625 | Sawgrass Mills Outlet II | 12801 W. Sunrise Blvd., Space 5040 | Sunrise | FL | 33323 |
| 1012 | South Beach | 805 Lincoln Road | Miami Beach | FL | 33139 |
| 1075 | Lakeside Galleria | 3301 Veterans Memorial Blvd., Space 71 | Metairie | LA | 70002 |
| 1106 | Renaissance at Colony Park | 1000 Highland Colony Parkway Suite 7003 | Ridgeland | MS | 39157 |
| 1043 | Palisades Center | 1432 Palisades Center Drive, Space B102 | West Nyack | NY | 10994 |
| 1011 | The Mall at Short Hills | 1200 Morris Turnpike, #C242 | Short Hills | NJ | 7078 |
| 1026 | Twelve Oaks Mall | 27322 Novi Road, Space # C-154A | Novi | MI | 48377 |
| 1031 | Beverly Center | 8522 Beverly Boulevard, Suite 786 | Los Angeles | CA | 90048 |
| 1142 | University Town Center | 140 University Town Center Dr. Suite #178 | Sarasota | FL | 34243 |
| 2631 | Dolphin Mall | 11401 N.W. 12th Street Suite 174 | Miami | FL | 33172 |
| 2633 | Great Lakes Crossing | 4716 Baldwin Road, Space #210A | Auburn Hills | MI | 48326 |
| 1096 | Aventura Mall | 19575 Biscayne Blvd., Suite 1361 | Aventura | FL | 33180 |
| 1141 | 500 Fifth Avenue | 500 Fifth Ave. 126, Storage Space 9 | New York | NY | 10010 |
| 1076 | SoHo | 107 Spring Street | New York | NY | 10012 |
| 1039 | Santa Anita Shopping Mall | 400 South Baldwin Ave, Suite 702-L | Arcadia | CA | 91007 |
| 1091 | JFK | BLDG 56A, Space B5, Concourse B | Jamaica | NY | 11430 |
| 1144 | World Trade Center | 185 Greenwich Street LL5140 | New York | NY | 10007 |
|  | Corporate Headquarters | 665 5th Avenue | New York | NY | 10022 |

**Local Rule 1007–2(a)(10)** (*the location of the debtor's substantial assets, the location of its books and records, and the nature, location and value of any assets held by the debtor outside the territorial limits of the United States*).

Response: Debtor's substantial assets—its inventory—are located in each of the leased retail locations, extra storage areas at each leased retail location, and a third party logistics warehouse at GSI. Debtor's books and records are maintained at its corporate headquarters at 665 5th Avenue, 8th floor, New York, NY 10022

**Local Rule 1007-2(a)(11)** (*the nature and present status of each action or proceeding, pending or threatened, against the debtor or its property where a judgment against the debtor or a seizure of its property may be imminent*).

Response: There are no imminent judgements or seizure of property. There is one ADA compliance claim that is related to two prior claims that have been settled, and two landlord claims that are in the process of being resolved. The Debtor does not expect that any of these claims will result in an imminent judgement or seizure of property.

**Local Rule 1007–2(a)(12)** (*the names of the individuals who comprise the debtor's existing senior management, their tenure with the debtor, and a brief summary of their relevant responsibilities and experience*).

Response:

- Mikey Rosenberg, CEO: Mr. Rosenberg started with the Debtor on July 1, 2019. Mr. Rosenberg has twenty years of wholesale experience with luxury brands and sales to major chains, and direct relationships with major brands, manufacturers, and wholesalers. Mr. Rosenberg is responsible for all day to day operations, purchasing, and company strategy.

- Claudio Luca Dotta, COO: Mr. Dotta started with the Debtor on July 1, 2019. Mr. Dotta has over twenty years of experience with his family's optical business, with extensive distribution experience in the European market and direct relationships with all product vendors headquartered in Italy. Mr. Dotta, as COO, is responsible for cash planning and maintaining bank relationships as well as oversight of the financial department. Mr. Dotta is also responsible for negotiations with product vendors and overall business planning and strategy.

**Local Rule 1007–2(b)(1)** (*the estimated amount of the weekly payroll to employees (exclusive of officers, directors, stockholders and partners) for the thirty (30) day period following the filing of the chapter 11 petition*).

Response: The estimated gross weekly payroll amount, exclusive of officers and directors, for the 30 day period following the filing is approximately $123,554.

**Local Rule 1007–2(b)(2)(A)** (*the amount paid and proposed to be paid for services for the thirty (30) day period following the filing of the chapter 11 petition, if the debtor is a corporation, to officers, stockholders, and directors*).

5

Response: The aggregate monthly payroll for Mr. Rosenberg (CEO) and Mr. Dotta (COO) is approximately $5,000.

**Local Rule 1007–2(b)(3)** (*a schedule, for the thirty (30) day period following the filing of the chapter 11 petition, of estimated cash receipts and disbursements, net cash gain or loss, obligations and receivables expected to accrue but remain unpaid, other than professional fees, and any other information relevant to an understanding of the foregoing*):

Response: To be provided.

# EXHIBIT B

## CORPORATE ORGANIZATION CHART

### SOLSTICE MARKETING CONCEPTS LLC

**CORETTE LLC**

a Delaware limited liability company.

Members: (1) Claudio Luca Dotta (50%); and Nathan Rosenberg (50%).

Purpose: Holds 100% of the equity in Fairway LLC and no other entities.

**G.S.I. CORP.**

a New York corporation.

Shareholders: (1) Gabriella Rosenberg (55%); (2) Michael Rosenberg (15%); (3) David Rosenberg (15%); and (4) Naomi Rosenberg (15%).

President/Chief Executive Officer: Nathan Rosenberg.

Purpose: Wholesale optical frame and sunglass trader.

Secured Creditor of Solstice Marketing Concepts LLC.

**FAIRWAY LLC**

a Nevada limited liability company.

Sole Members and Manager: Corette LLC (100%).

Purpose: Holds 100% of the equity in Solstice

**DEBTOR:**

**SOLSTICE MARKETING CONCEPTS LLC**

a Delaware limited liability company.

Sole Member and Manager: Fairway LLC (100%).

Chief Restructuring Officer: Jacen Dinoff.

Chief Executive Officer: Michael Rosenberg.

Purpose: Brick and mortar and online sunglasses retailer