# EXHIBIT A

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| SOLSTICE MARKETING CONCEPTS LLC, | Case No. 21-10306 (MG) |
| Debtor.[1] | |

## INTERIM ORDER (I) AUTHORIZING DEBTOR TO OBTAIN POSTPETITION FINANCING, (II) SCHEDULING A FINAL HEARING; AND (III) GRANTING RELATED RELIEF

This matter having come before the Court upon the motion (the "**DIP Motion**") by Solstice Marketing Concepts LLC, a Delaware limited liability company, as a debtor and debtor in possession (the "**Borrower**" or the "**Debtor**") in the above-captioned chapter 11 case (the "**Case**"), pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of Title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 4001-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Rules**"), seeking entry of an interim order (this "**Interim Order**") *inter alia*:

> (i)     authorizing the Debtor to obtain a secured, superpriority postpetition financing (the "**DIP Facility**"), consisting of a senior secured super-priority asset-based revolving credit facility, on the terms and conditions set forth in that certain Summary of Indicative Terms and Conditions annexed hereto as **Exhibit 1** (as the same may be amended, supplemented, waived, extended, restated, or otherwise modified from time to time or to the extent any credit agreement is executed and delivered, as superseded by such credit agreement, the "**DIP Credit Agreement**") by and among the Debtor, the Lenders party thereto (the "**DIP Lenders**" and each a "**DIP Lender**"), and

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number, is: Solstice Marketing Concepts LLC (4579).

Second Avenue Capital Partners LLC, as Administrative Agent and Collateral Agent (the "**DIP Agent**") for the DIP Lenders in an aggregate principal amount (subject to availability) of up to $6,500,000 in revolving loan commitments (such loans outstanding under any of the DIP Loan Documents from time to time, collectively, the "**DIP Loans**");

(ii)     authorizing the Debtor to execute and deliver the DIP Credit Agreement and all other related documents and agreements, including (without limitation) the Interim Order and the Final Order, security agreements, deposit account control agreements, pledge agreements, guaranties and promissory notes (collectively, the "**DIP Loan Documents**") and to perform such other acts as may be necessary or desirable in connection with the DIP Loan Documents;[2]

(iii)     granting allowed superpriority administrative expense claim status in the Case and any Successor Case (as defined herein) to all obligations owing under the DIP Credit Agreement and the other DIP Loan Documents to the DIP Agent and the DIP Lenders (collectively, and including all "DIP ABL Facility Obligations" as described in the DIP Credit Agreement, the "**DIP Obligations**"), subject to the priorities set forth herein;

(iv)     authorizing the Debtor to use, in accordance with the Approved DIP Budget (as defined below), "**Cash Collateral**," as defined in section 363(a) of the Bankruptcy Code, that the Debtor is holding or may obtain, pursuant to sections 361 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b) and 6004;

(v)     granting to the DIP Agent, for the benefit of the DIP Lenders, automatically perfected, priming, first-priority security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting Cash Collateral), which liens shall be subject to the priorities set forth herein;

(vi)     authorizing and directing the Debtor to pay the principal, interest, fees, expenses and other amounts payable under each of the DIP Loan Documents as they become due, including, without limitation, commitment or unused line fees, closing fees, arrangement fees, maintenance fees and exit fees, the reasonable fees and disbursements of the DIP Agent's and DIP Lenders' attorneys, advisers, accountants, and other consultants, and all related expenses of the DIP Agent and DIP Lenders, all to the extent provided by and in accordance with the terms of the respective DIP Loan Documents and this Interim Order;

---

[2]  Capitalized terms used but not defined have the meanings given to them in the DIP Loan Documents or the DIP Motion.

(vii)    modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(viii)   granting related relief; and

(ix)     scheduling a final hearing (the "**Final Hearing**") to consider the relief requested in the DIP Motion and approving the form of notice with respect to the Final Hearing.

The Court having considered the DIP Motion, the First Day Declaration, the exhibits attached thereto, the DIP Loan Documents, and the evidence submitted or adduced and the arguments of counsel made at the interim hearing held on the DIP Motion (the "**Interim Hearing**"); and notice of the Interim Hearing having been given in accordance with Bankruptcy Rules 4001(b), (c) and (d), 9014 and Local Bankruptcy Rule 4001-2; and the Interim Hearing to consider the interim relief requested in the DIP Motion having been held and concluded; and all objections, if any, to the interim relief requested in the DIP Motion having been withdrawn, resolved or overruled by the Court; and it appearing to the Court that, pursuant to Bankruptcy Rule 4001(c)(2), granting the interim relief requested is necessary to avoid immediate and irreparable harm to the Debtor and its estate pending the Final Hearing, and otherwise is fair and reasonable and in the best interests of the Debtor, its estate, and its creditors and equity holders, and is essential for the continued operation of the Debtor's businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor;

BASED UPON THE RECORD ESTABLISHED AT THE INTERIM HEARING BY THE DEBTOR, INCLUDING THE SUBMISSION OF THE FIRST DAY DECLARATION AND THE REPRESENTATIONS OF COUNSEL, THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    *Petition Date*.  On February 17, 2021 (the "**Petition Date**"), the Debtor filed a voluntary petition under chapter 11 (Subchapter V) of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "**Court**") commencing the Case.

B.    *Debtor in Possession*.  The Debtor is continuing in the management and operation of its businesses and properties as debtor in possession pursuant to sections 1107 and 1108 and section 1185 of the Bankruptcy Code.

C.    *Jurisdiction and Venue*.  The Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012, over these proceedings and over the persons and property affected hereby. Consideration of the DIP Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2).  Venue for the Case and proceedings on the DIP Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.    *Subchapter V*.  The Office of the United States Trustee (the "**U.S. Trustee**") has appointed a trustee under section 1183 of the Bankruptcy Code (a "**Statutory Trustee**").  No official committee shall be appointed in the Case.

E.    [Reserved]

F.    *Findings Regarding Corporate Authority*.  The Debtor has all requisite power and authority to execute and deliver the DIP Loan Documents to which it is a party and to perform its obligations thereunder.

G.    *Findings Regarding the Postpetition Financing*.

(i)    *Request for Postpetition Financing*.  The Debtor seeks authority to (a) enter into the DIP Facility on the terms described herein and in the DIP Loan Documents, and (b) use Cash Collateral on the terms described herein to administer its Case and fund its operations.  At

the Final Hearing, the Debtor will seek final approval of the proposed postpetition financing arrangements and the use of Cash Collateral pursuant to a proposed final order (the "**Final Order**"), which shall be in form and substance acceptable to the DIP Agent and DIP Lenders. Notice of the Final Hearing and Final Order will be provided in accordance with this Interim Order.

(ii)     *Need for Postpetition Financing and Use of Cash Collateral*.  The DIP Facility is a "new money" loan, as neither the DIP Agent nor the DIP Lenders are existing creditors of the Debtor.  The Debtor's need to use Cash Collateral and to obtain credit pursuant to the DIP Facility is immediate and critical in order to enable the Debtor to continue operations and to administer and preserve the value of its estate.  The ability of the Debtor to finance its operations, confirm a plan of reorganization, maintain business relationships, pay its employees, protect the value of its assets and otherwise finance its operations requires the availability of working capital from the DIP Facility and the use of Cash Collateral, the absence of either of which would immediately and irreparably harm the Debtor, and its estate, employees, creditors and equity holders, and the possibility for a successful administration of this Case.  The Debtor does not have sufficient available sources of working capital and financing to operate its businesses, confirm a plan of reorganization or to maintain its properties in the ordinary course of business without the DIP Facility and authorized use of Cash Collateral. In the absence of the DIP Facility, it is likely the Debtor will not be able to continue as a going concern.

(iii)     *No Credit Available on More Favorable Terms*.  Given its current financial condition, financing arrangements, and capital structure, and the continuing crisis facing the retail industry as a result of the COVID-19 pandemic, the Debtor is unable to obtain financing from sources other than the DIP Agent and DIP Lenders on terms more favorable than the DIP Facility. Notwithstanding its efforts with the assistance of its advisors, the Debtor has been unable to obtain

unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense. The Debtor also has been unable to obtain credit: (a) having priority over that of administrative expenses of the kind specified in sections 503(b), 507(a) and 507(b) of the Bankruptcy Code; (b) secured by a lien on property of the Debtor and its estate that is not otherwise subject to a lien; or (c) secured solely by a junior lien on property of the Debtor and its estate that is subject to a lien. Financing on a postpetition basis is not otherwise available without granting the DIP Agent, for the benefit of the DIP Lenders, (1) perfected security interests in and liens on (each as provided herein) all of the Debtor's existing and after-acquired assets with the priorities set forth herein, (2) superpriority claims, and (3) the other protections set forth in this Interim Order.

(iv) *Use of Proceeds of the DIP Facility*. As a condition to entry into the DIP Credit Agreement, the extensions of credit under the DIP Facility and the authorization to use Cash Collateral, the DIP Agent and DIP Lenders require, and the Debtor has agreed, that proceeds of the DIP Facility shall be used in a manner consistent with the terms and conditions of the DIP Loan Documents and in accordance with the budget (a copy of which is attached as **Exhibit 2** hereto, as the same may be modified from time to time consistent with the terms of the DIP Loan Documents and this Interim Order, the "**Approved DIP Budget**"), and subject to such variances as may be permitted thereby, solely for (i) post-petition operating expenses and other working capital, (ii) certain transaction fees and expenses, (iii) permitted payment of costs of administration of the Case, including professional fees to the extent permitted by the DIP Loan Documents and this Interim Order, and (iv) as otherwise permitted under the DIP Loan Documents.

(v) *Application of Proceeds of DIP Collateral*. As a condition to entry into the DIP Loan Documents, the extension of credit under the DIP Facility, and the authorization to use

Cash Collateral, the Debtor, the DIP Agent and DIP Lenders have agreed that the proceeds of DIP Collateral (as defined herein) shall be applied in accordance with paragraph 16 of this Interim Order.

H.  *Section 506(c)*.  In light of (i) the DIP Agent's and DIP Lenders' agreement to subordinate its liens and superpriority claims, as applicable, to the Carve Out (as defined herein), and (ii) the payment of expenses as set forth in the Approved DIP Budget, in accordance with and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, at the Final Hearing, the Debtor will seek a ruling that, upon entry of the Final Order, the DIP Agent and DIP Lenders are entitled to a waiver of the provisions of section 506(c) of the Bankruptcy Code.

I.  *Good Faith of the DIP Agent and DIP Lenders*.

(i)  *Willingness to Provide Financing*.  The DIP Agent and DIP Lenders have agreed to provide financing to the Debtor subject to: (a) the entry of this Interim Order and the Final Order; (b) approval of the terms and conditions of the DIP Facility and the DIP Loan Documents; (c) satisfaction of the closing conditions set forth in the DIP Loan Documents; and (d) entry of each of the following findings by the Court: that such financing is essential to the Debtor's estate, that the DIP Agent and DIP Lenders are extending credit to the Debtor pursuant to the DIP Loan Documents in good faith, that the DIP Agent and DIP Lenders have acted in good faith, and that the DIP Agent's and DIP Lenders' claims, superpriority claims, security interests, liens, rights, and other protections granted pursuant to this Interim Order and the DIP Loan Documents will have the protections provided in sections 363(m) and 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, reargument or reconsideration of this Interim Order or any other order.

(ii)    *Business Judgment and Good Faith Pursuant to Sections 363(m) and 364(e)*.  The extension of credit under the DIP Facility reflects the Debtor's exercise of its prudent business judgment consistent with its fiduciary duties, and is supported by reasonably equivalent value and consideration.  The DIP Facility and the use of Cash Collateral were negotiated in good faith and at arms' length among the Debtor, the DIP Agent and the DIP Lenders, with the assistance and counsel of its respective advisors, and the DIP Agent and DIP Lenders have acted in good faith.  The use of Cash Collateral and credit to be extended under the DIP Loan Documents shall be deemed to have been so allowed, advanced, made, used or extended in good faith, and for valid business purposes and uses, within the meaning of sections 363(m) and 364(e) of the Bankruptcy Code, and the DIP Agent and DIP Lenders are therefore entitled to the protection and benefits of sections 363(m) and 364(e) of the Bankruptcy Code and this Interim Order.

J.    *Notice*.  Notice of the Interim Hearing and the emergency relief requested in the DIP Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including:  (i) the U.S. Trustee; (ii) the Internal Revenue Service; (iii) the parties included on the Debtor's consolidated list of twenty (20) largest unsecured creditors; (iv) counsel to any other lienholders of record; (v) G.S.I. Corporation ("**GSI**") and (vi) those parties who have filed a notice of appearance and request for service of pleadings in the Case pursuant to Bankruptcy Rule 2002.  The Debtor has made reasonable efforts to afford the best notice possible under the circumstances and such notice is good and sufficient to permit the interim relief set forth in this Interim Order, and no other or further notice is or shall be required.

K.    GSI is an affiliate of the Debtor and asserts a security interest in certain of the Debtor's assets.  GSI has consented to the entry of this Order, including the grant to the DIP Agent of the priming DIP Liens set forth herein. Further, GSI, the Debtor and the DIP Agent have entered

into a Subordination Agreement dated as of February [●], 2021 (the "**Subordination Agreement**"), a copy of which is annexed hereto as part of **Exhibit 3**. The GSI Subordination Agreement is a "subordination agreement" within the meaning of section 510(a) of the Bankruptcy Code and shall be enforceable in the Case and any Successor Case to the same extent as enforceable under applicable nonbankruptcy law.

L.     *Immediate Entry*.  Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(c)(2).

Based upon the foregoing findings and conclusions, the DIP Motion and the record before the Court with respect to the DIP Motion, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.     <u>DIP Financing Approved on an Interim Basis</u>.  The DIP Motion is granted as set forth herein on an interim basis, the DIP Financing is authorized and approved on an interim basis, and the use of Cash Collateral on an interim basis is authorized, in each case subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.

2.     <u>Objections Overruled</u>.  All objections to approval of the DIP Financing on an interim basis, to the extent not withdrawn, waived, settled, or resolved, are hereby overruled.

**<u>DIP Facility Authorization</u>**

3.     <u>Authorization of the DIP Financing and DIP Loan Documents</u>.  The Debtor is expressly and immediately authorized and empowered (i) to execute and deliver the DIP Loan Documents, (ii) to incur and to perform the DIP Obligations in accordance with, and subject to, the terms of this Interim Order, the DIP Loan Documents and the Approved DIP Budget,  and (iii) to deliver all instruments and documents that may be necessary or required for performance by the Debtor under the DIP Facility and the creation and perfection of the DIP Liens described in and provided for by this Interim Order and the DIP Loan Documents. The Debtor is hereby authorized

to pay the principal, interest, fees, expenses and other amounts described in the DIP Loan Documents as such become due and without need to obtain further Court approval, including, without limitation, commitment or unused line fees, arrangement fees, closing fees, monitoring fees and exit fees, the reasonable fees and disbursements of the DIP Agent's and the DIP Lenders' attorneys, advisers, accountants, and other consultants and professional persons, all to the extent provided in the DIP Loan Documents. All collections and proceeds, whether from ordinary course collections, asset sales, debt issuances, insurance recoveries, condemnations or otherwise, will be deposited and applied as required by this Interim Order and the DIP Loan Documents. Upon execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtor, enforceable against the Debtor and its estate in accordance with its terms.

4. <u>Interim Authorization to Borrow</u>. Until the earliest to occur of (i) entry of the Final Order or (ii) the Termination Declaration Date (as defined in the DIP Credit Agreement), and subject to the terms, conditions, limitations on availability and reserves set forth in the DIP Loan Documents, the DIP Facility, and this Interim Order, and in order to prevent immediate and irreparable harm to the Debtor's estate, the Debtor is hereby authorized to request extensions of revolving credit under the DIP Facility sufficient to conduct ongoing business operations up to an aggregate principal amount of $2,000,000.00 (comprised of actual funds disbursed) at any one time outstanding (the "**DIP Financing**") between the date of the entry of this Interim Order and the entry of the Final Order.

5. <u>DIP Obligations</u>. The DIP Loan Documents and this Interim Order shall constitute and evidence the validity and binding effect of the Debtor's DIP Obligations, which DIP Obligations shall be enforceable against the Debtor, its estate and any successors thereto, including without limitation, any trustee or other estate representative appointed in the Case, or any case

under Chapter 7 of the Bankruptcy Code upon the conversion of the Case (collectively, any "**Successor Case**").  Upon entry of this Interim Order, the DIP Obligations will include all loans and any other indebtedness, indemnities or obligations, contingent or absolute, which may now or from time to time be owing by the Debtor to the DIP Agent and DIP Lenders under the DIP Loan Documents or this Interim Order, including, without limitation, all principal, accrued interest, costs, fees, expenses, indemnities and other amounts owed pursuant to the DIP Loan Documents, and shall be obligations of the Debtor in all respects.  Without limiting the foregoing, the DIP Obligations shall also include cash management exposure to the extent described in, or secured by, the DIP Loan Documents.  The DIP Obligations shall be due and payable, without notice or demand, and the use of Cash Collateral shall automatically cease on the Termination Declaration Date, except as provided in paragraph 21 herein.  No obligation, payment, transfer, or grant of collateral security hereunder or under the DIP Loan Documents (including any DIP Obligations or DIP Liens) shall be stayed, restrained, voidable, avoidable, or recoverable, under the Bankruptcy Code or under any applicable law (including under sections 502(d), 544, and 547 to 550 of the Bankruptcy Code or under any applicable state Uniform Voidable Transactions Act, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

6.     DIP Liens and DIP Collateral.

(a)     Effective immediately upon the entry of this Interim Order, pursuant to sections 361, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Agent (for itself

and the ratable benefit of the DIP Lenders) is hereby granted, continuing valid, binding, enforceable, first-priority, non-avoidable, priming and automatically and properly perfected postpetition security interests in and liens on (collectively, the "**DIP Liens**") any and all presently owned and hereafter acquired assets and real and personal property of the Debtor, including, without limitation, the following (the "**DIP Collateral**"):

(i) all Accounts[3];

(ii) all Goods, including Equipment, Inventory and Fixtures;

(iii) all Documents, Instruments and Chattel Paper;

(iv) all Letters of Credit and Letter-of-Credit Rights;

(v) all Securities Collateral;

(vi) all Investment Property;

(vii) all Intellectual Property Assets;

(viii) all Commercial Tort Claims;

(ix) all General Intangibles (including, without limitation, all Payment Intangibles);

(x) all Deposit Accounts (including, without limitation, the Concentration Account);

(xi) all Supporting Obligations;

(xii) all money, cash or cash equivalents;

(xiii) all credit balances, deposits and other property now or hereafter held or received by or in transit to the DIP Agent or at any other depository or other institution

---

[3] All defined terms in the description of DIP Collateral shall have the meanings ascribed thereto in the DIP Loan Documents. All terms not specifically defined in the DIP Loan Documents shall have the meanings ascribed to such terms in Article 8 or 9 of the Uniform Commercial Code, as applicable.

from or for the account of the Debtor, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

(xiv)    all proceeds of leases of real property and all owned real property;[4]

(xv)    all claims and causes of action and the proceeds thereof to avoid a transfer of property (or an interest in property) pursuant to section 549 of the Bankruptcy Code;

(xvi)    subject to the entry of the Final Order, all other claims and causes of action, and any proceeds thereof, to avoid a transfer of property (or an interest in property) or an obligation incurred by the Debtor pursuant to any applicable section of the Bankruptcy Code, including, without limitation, chapter 5 and section 724(a) of the Bankruptcy Code (collectively, the "**Avoidance Actions**");

(xvii)    to the extent not otherwise described above, all receivables and all present and future claims, rights, interests, assets and properties recovered by or on behalf of the Debtor;

(xviii)    all books, records, and information relating to any of the foregoing and/or to the operation of the Debtor's business, and all rights of access to such books, records, and information, and all property in which such books, records and information are stored, recorded and maintained; and

(xix)    to the extent not otherwise included or specifically excluded, all other personal property of the Debtor, whether tangible or intangible and all Proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits

---

[4]    For the avoidance of doubt, the DIP Liens extend only to the proceeds of leased real property and are not direct liens on the Debtor's leases of real property unless such liens are expressly permitted pursuant to the underlying lease documents.

and products of each of the foregoing, and any and all proceeds of any insurance, indemnity, warranty or guaranty payable to the Debtor from time to time with respect to any of the foregoing.

7.      <u>DIP Lien Priority</u>.

(a)      *DIP Liens*.  Upon entry of the Interim Order, the DIP Liens shall be junior only to the Carve Out, and shall otherwise be senior in priority and superior to any other security interest, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral. Without limiting the foregoing, the DIP Liens shall be senior in all respects to any security interest or lien asserted by GSI.

(b)      Other than as set forth herein, the DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or any Successor Case.  The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Case or any Successor Case, upon the conversion of the Case to any case under Chapter 7 of the Bankruptcy Code (or in any Successor Case), and/or upon the dismissal of the Case or any Successor Case.  The DIP Liens shall not be subject to challenge under sections 510, 549, or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estate pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the DIP Liens.

8.      <u>DIP Superpriority Claim</u>.

(a)      *DIP Agent Superpriority Claim*.  Upon entry of this Interim Order, the DIP Agent (for itself and the ratable benefit of the DIP Lenders) is hereby granted, pursuant to section 364(c)(1) of the Bankruptcy Code, an allowed superpriority administrative expense claim in the Case and any Successor Case (collectively, the "**DIP Superpriority Claim**") for all DIP Obligations.  The DIP Superpriority Claim shall be subordinate only to the DIP Liens and the

Carve Out, shall be senior in all respects to any security interest, lien or claim asserted by GSI and shall otherwise have priority over any and all administrative expenses of the kinds specified in or ordered pursuant to sections 503(b) and 507(b) of the Bankruptcy Code, as provided under section 364(c)(1) of the Bankruptcy Code.

        (b)     *Priority of DIP Superpriority Claim.* Effective upon entry of this Interim Order, the DIP Superpriority Claim shall be payable from and have recourse to all pre- and post-petition property of the Debtor and all proceeds thereof, subject only to the payment in full in cash of the DIP Obligations and the Carve Out.

        9.     <u>No Obligation to Extend Credit</u>.  The DIP Agent and the DIP Lenders shall not have any obligation to make any loan or advance under the DIP Loan Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the DIP Agent and the DIP Lenders in accordance with the terms of the DIP Credit Agreement.

        10.     <u>Use of DIP Facility Proceeds</u>.  From and after the Petition Date, the Debtor shall use advances of credit under the DIP Facility only for the purposes specifically set forth in this Interim Order, the DIP Loan Documents and the Approved DIP Budget and shall be subject at all times to compliance with the Approved DIP Budget, subject to any variances as may be permitted under the DIP Credit Agreement.

### <u>Authorization to Use Cash Collateral</u>

        11.     <u>Authorization to Use Cash Collateral</u>.  Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, and in accordance with the Approved DIP Budget, and subject to such variances as may permitted under the DIP Credit Agreement, the Debtor is authorized to use Cash Collateral until the Termination Declaration Date.  Nothing in this Interim

Order shall authorize the disposition of any assets of the Debtor or its estate outside the ordinary course of business (which shall be subject to further Orders of the Court), or the Debtor's use of any Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Loan Documents and in accordance with the Approved DIP Budget.

**Provisions Common to DIP Financing and Use of Cash Collateral Authorizations**

12.     <u>Amendments</u>.  The DIP Loan Documents may from time to time be amended, modified or supplemented by the parties thereto without further Order of this Court and without notice or a hearing if such amendment, modification, or supplement is (A) non-material and (b) in accordance with the DIP Loan Documents.  In the case of a material amendment, modification, or supplement to the DIP Loan Documents that is adverse to the Debtor's estate, the Debtor shall provide notice (which may be provided through electronic mail or facsimile) to counsel to the Statutory Trustee and the U.S. Trustee (collectively, the "<u>Notice Parties</u>"), each of whom shall have five (5) days from the date of such notice to object in writing to such amendment, modification or supplement.  If none of the Notice Parties indicates that it has an objection to the amendment, modification or supplement, the Debtor may proceed to execute the amendment, modification or supplement, which shall become effective immediately upon execution.  If a Notice Party timely objects to such amendment, modification or supplement, and such objection is not consensually resolved by the Debtor, the DIP Agent, the DIP Lenders and the objecting Notice Party, approval of the Court (which may be sought on an expedited basis) will be necessary to effectuate the amendment, modification or supplement; <u>provided</u>, that such amendment, modification or supplement shall be without prejudice to the right of any party in interest to be heard.  Any material modification, amendment or supplement that becomes effective in accordance with this paragraph 12 shall be filed with the Court by the Debtor no later than three (3) business

days after becoming effective (and may be filed with the Court by the DIP Agent if the Debtor fails to do so within such time period).

13.  Approved DIP Budget Maintenance.  The use of borrowings under the DIP Facility and the use of Cash Collateral shall be limited in accordance with the Approved DIP Budget, subject to the variances set forth in the DIP Credit Agreement.  The Approved DIP Budget and any modification to, or amendment or update of, the Approved DIP Budget shall be in form and substance acceptable to the DIP Agent and the DIP Lenders and approved by the DIP Agent and the DIP Lenders in their sole discretion.  The Debtor shall comply with and update the Approved DIP Budget from time to time in accordance with the DIP Loan Documents (provided that any update shall be in form and substance acceptable to the DIP Agent and the DIP Lenders and approved by the DIP Agent and the DIP Lenders in their sole discretion), but in any event not less than on a weekly basis (with delivery to the DIP Agent on or before Wednesday of each week (or such day as otherwise agreed to by the DIP Agent) and to the U.S. Trustee and counsel for any Statutory Trustee each week after delivery to the DIP Agent), and no such updated, modified, or supplemented budget shall be effective until so approved and once approved shall be deemed the "Approved DIP Budget".  Each budget delivered to the DIP Agent shall be accompanied by such supporting documentation as reasonably requested by the DIP Agent and shall be prepared in good faith based upon assumptions the Debtor believe to be reasonable.

14.  Modification of Automatic Stay.  The automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms and provisions of this Interim Order, including, without limitation, to:  (a) permit the Debtor to grant the DIP Liens and the DIP Superpriority Claim; (b) permit the Debtor to perform such acts as the DIP Agent may reasonably request to assure the perfection and priority of the liens granted herein;

(c) permit the Debtor to incur all liabilities and obligations to the DIP Agent and DIP Lenders under the DIP Loan Documents, the DIP Facility, and this Interim Order, as applicable; (d) authorize the Debtor to pay, and the DIP Agent and the DIP Lenders to retain and apply, payments made in accordance with the terms of this Interim Order, and (e) permit the DIP Agent and DIP Lenders to accept and enforce, in accordance with its terms, the Parent Guaranty (as define in paragraph 46 of this Order).

15.     <u>Perfection of DIP Liens</u>.  This Interim Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement, collateral access agreement, customs broker agreement or freight forwarding agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Agent to the priorities granted herein.  Notwithstanding the foregoing, the DIP Agent is authorized to file, as the DIP Agent in its sole discretion deems necessary, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence any of the DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; *provided*, *however*, that no such filing or recordation shall be necessary or required in order to create, perfect or enforce the DIP Liens.  The Debtor is authorized to execute and deliver, promptly upon demand to the DIP Agent, all such financing statements, mortgages, control agreements, notices and other documents as the DIP Agent may reasonably request.  The DIP Agent, in its sole discretion, may file a photocopy of this Interim Order as a

financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

16. <u>Application of Proceeds of DIP Collateral</u>. As a condition to the entry into the DIP Loan Documents, the extension of credit under the DIP Facility and the authorization to use Cash Collateral, subject to the Carve Out, the Debtor has agreed that the proceeds of the DIP Collateral, and other payments received by the DIP Agent and the DIP Lenders, including assets sold in the ordinary course, liquidated pursuant to any agreement with a liquidator, or otherwise, shall be applied as provided in the DIP Credit Agreement, or, to the extent the DIP Credit Agreement does not direct the application of such amounts, as follows: *first*, to payment of the costs and expenses of the DIP Agent and DIP Lenders, including expenses payable and reimbursable by the Debtor under the DIP Credit Agreement and the other DIP Loan Documents; *second*, to payment of fees and interest with respect to the DIP Obligations, *third*, to payment of all other DIP Obligations in accordance with the DIP Loan Documents until all DIP Obligations have been paid in full in cash, and *fourth*, to the Debtor's operating account, or for the account of and paid to whomever may be lawfully entitled thereto. As between the DIP Agent and the DIP Lenders, nothing provided herein shall be deemed to modify the allocation of the proceeds of DIP Collateral set forth in the DIP Loan Documents.

17. <u>Proceeds of Subsequent Financing</u>. If the Debtor, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in this Case or any Successor Case shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Loan Documents at any time prior to the indefeasible repayment in full, in cash, of all DIP Obligations and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, including

subsequent to the confirmation of any plan of reorganization or liquidation with respect to the Debtor and its estate, then all the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent to be applied as set forth in paragraph 16 herein.

18.     <u>Maintenance of DIP Collateral</u>.     Until the payment in full in cash of all DIP Obligations, and the termination of the DIP Agent's and the DIP Lenders' obligations to extend credit under the DIP Facility, as provided therein, the Debtor shall:  (a) insure the DIP Collateral as required under the DIP Facility; and (b) maintain the cash management system as approved by the Court.

19.     <u>Disposition of DIP Collateral; Rights of DIP Agent and DIP Lenders</u>.  Unless (i) the DIP Agent and the DIP Lenders have provided their prior written consent, (ii) all DIP Obligations have been indefeasibly paid in full, in cash, and all obligations to extend credit under the DIP Facility have terminated or (iii) otherwise authorized by the Court after notice to the DIP Agent and the DIP Lenders:

(a)     The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral outside the ordinary course of business except as permitted by the DIP Loan Documents.  Nothing provided herein shall limit the right of the DIP Agent or the DIP Lenders to object to any proposed disposition of the DIP Collateral;

(b)     There shall not be entered in the Case or any Successor Case any order (including any order confirming any plan of reorganization or liquidation) that authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case that is superior to or *pari passu* with the DIP Liens, or the DIP Superpriority Claim, except as expressly set forth in this Interim

Order or the DIP Loan Documents; (ii) the use of Cash Collateral for any purpose other than as permitted in the DIP Loan Documents and this Interim Order; (iii) the return of goods pursuant to section 546(h) of the Bankruptcy Code (or other return of goods on account of any prepetition indebtedness or consignment arrangement) to any creditor of the Debtor or any creditor's taking any setoff or recoupment against any of its prepetition indebtedness based upon any such return of goods pursuant to section 553 of the Bankruptcy Code or otherwise; or (iv) any modification of the DIP Agent's or DIP Lenders' rights under this Interim Order or the DIP Loan Documents; and

(c)     The Debtor (and/or its professional advisors in the case of clauses (ii) through (iv) below) shall (i) maintain books, records, and accounts to the extent and as required by the DIP Loan Documents (and subject to the applicable grace periods set forth therein); (ii) cooperate with, consult with, and provide to the DIP Agent and the DIP Lenders all such information and documents that the Debtor is obligated (including upon reasonable request by the DIP Agent or the DIP Lenders) to provide under the DIP Loan Documents or the provisions of this Interim Order; (iii) upon reasonable advance notice, permit the DIP Agent, the DIP Lenders and their advisors to visit and inspect any of the Debtor's respective properties, to examine and make abstracts or copies from any of its books and records, to tour the Debtor's business premises and other properties, and to discuss, and provide advice with respect to, its affairs, finances, properties, business operations, and accounts with its officers, employees, independent public accountants, and other professional advisors (other than legal counsel) as and to the extent required by the DIP Loan Documents; (iv) permit the DIP Agent, the DIP Lenders and their advisors to consult with the Debtor's management and advisors on matters concerning the Debtor's businesses, financial condition, operations, and assets in accordance with the DIP Loan Documents; and (v) upon reasonable advance notice, permit the DIP Agent to conduct, at the Debtor's cost and expense,

field audits, collateral examinations, liquidation valuations, and inventory appraisals at reasonable intervals in respect of any or all of the DIP Collateral in accordance with, and to the extent set forth in, the DIP Loan Documents.

20.     Credit Bidding.  In connection with any sale process commenced by the Debtor or otherwise authorized by the Court, the DIP Agent may credit bid some or all of the claims of the DIP Agent and the DIP Lenders for the DIP Collateral (each a "Credit Bid") pursuant to section 363(k) and/or section 1129 of the Bankruptcy Code.  The DIP Agent shall be considered a "qualified bidder" with respect to its rights to acquire all or any of the assets by Credit Bid.

21.     Termination Declaration Date.  On the Termination Declaration Date, at the option of the DIP Agent: (a) all applicable DIP Obligations shall be immediately due and payable, all commitments to extend credit under the DIP Facility will terminate, other than as required in paragraph 29 with respect to the Carve Out, all treasury and cash management, hedging obligations and bank product obligations constituting DIP Obligations shall be cash collateralized in a manner and amount acceptable to the DIP Agent, and none of such cash collateral shall be subject to or subordinate to the Carve Out; (b) all authority to use Cash Collateral shall cease, *provided, however*, that during the Remedies Notice Period (as defined herein), the Debtor may use Cash Collateral to pay payroll obligations (other than severance), make remittances of trust fund taxes collected by the Debtor during the Remedies Notice Period, and for other expenses critical to the preservation of the Debtor and its estate, as agreed by the DIP Agent in its sole discretion; and (c) otherwise exercise rights and remedies under the DIP Loan Documents in accordance with this Interim Order (including paragraph 23 hereof).

22.     Events of Default.  The occurrence of an "event of default" under the DIP Credit Agreement (unless the DIP Agent, in its sole discretion, elect to waive such Event of Default in

accordance with the terms of the DIP Credit Agreement) shall constitute an event of default under this Interim Order (each, an "**Event of Default**").[5]

23.     Rights and Remedies Upon Event of Default.

(a)     *DIP Facility Termination.*  Immediately upon the occurrence and during the continuance of an Event of Default, notwithstanding the provisions of section 362 of the Bankruptcy Code, without any application, motion or notice to, hearing before, or order from the Court, but subject to the terms of this Interim Order, the DIP Loan Documents and the Remedies Notice Period, the DIP Agent may, in its sole discretion, (a) declare any or all of the following (any such declaration shall be referred to herein as a "**Termination Declaration**"): (i) all DIP Obligations owing under the DIP Loan Documents to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Debtor to the extent any such commitment remains under the DIP Facility, (iii) termination of the DIP Facility and the DIP Loan Documents as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the DIP Liens or the DIP Obligations, and (iv) that the application of the Carve Out has occurred through the delivery of the Carve Out Trigger Notice (as defined herein) to the Debtor and its counsel, the U.S. Trustee, and the Statutory Trustee or (b) send a reservation of rights notice to the Debtor, which notice may advise the Debtor that any further advances under the DIP Facility will be made in the sole discretion of the DIP Agent and the DIP Lenders, and/or that default interest shall accrue as provided for in the DIP Loan Agreement.  With respect to the DIP Collateral, following the Termination Declaration but subject to the Remedies Notice Period, the DIP Agent and the DIP Lenders may exercise all rights and

---

[5] Events of Default under the DIP Credit Agreement are specified in the "Events of Default" section of the DIP Credit Agreement, which is attached hereto as Exhibit 1.   The Events of Default section begins on page 13 of the DIP Credit Agreement and ends on page 14.

remedies available to them under the DIP Loan Documents or applicable law against the DIP Collateral. Without limiting the foregoing, the DIP Agent and the DIP Lenders may, subject to the Remedies Notice Period, (i) upon written notice to the landlord of any leased premises that an Event of Default or the Termination Declaration Date has occurred and is continuing, and subject to the applicable notice provisions, if any, in this Interim Order and any separate applicable agreement by and between such landlord, enter onto the premises of the Debtor for the purpose of exercising any remedy with respect to DIP Collateral located thereon and shall be entitled to all of the Debtor's rights and privileges as lessee under such lease without interference from the landlords thereunder;[6] and/or (ii) exercise any rights and remedies provided to DIP Agent or the DIP Lenders under the DIP Loan Documents or at law or equity, including all remedies provided under the Bankruptcy Code and pursuant to this Interim Order. Following the termination of the Remedies Notice Period, the DIP Agent and the DIP Lenders may require the Debtor to seek authority from the Court to retain a professional acceptable to the DIP Agent and the DIP Lenders for the purpose of conducting a liquidation or "going out of business" sale and/or the orderly liquidation of the DIP Collateral and, if Debtor refuses to seek such authority, the DIP Agent and the DIP Lenders shall be entitled to seek such authority directly.

(b) *Notice of Termination*. Any Termination Declaration shall be given by facsimile (or other electronic means, including electronic mail) to counsel to the Debtor, the Statutory Trustee, and the U.S. Trustee. Notice to the U.S. Trustee shall be given by electronic mail to the following addresses: susan.arbeit@usdoj.gov. Any automatic stay otherwise applicable

---

[6] Notwithstanding anything in this paragraph to the contrary, subject to (and without waiver of) the rights of the DIP Agent and/or the DIP Lenders under applicable non-bankruptcy law, the DIP Agent and/or the DIP Lenders can only enter upon a leased premises after an Event of Default and expiration of the Remedies Notice Period in accordance with (i) a separate agreement with the landlord at the applicable leased premises, or (ii) upon entry of an order of this Court obtained by motion of the DIP Agent and/or the applicable DIP Lenders on such notice to the landlord as shall be required by this Court.

to the DIP Agent and the DIP Lenders is hereby modified so that five (5) business days after the Termination Declaration Date (the "**Remedies Notice Period**"), the DIP Agent and the DIP Lenders shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Loan Documents and this Interim Order and shall be permitted to satisfy the DIP Superpriority Claim and the DIP Liens, subject in each case to the Carve Out. During the Remedies Notice Period, the Debtor shall be entitled to seek an emergency hearing with the Court for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing; provided, that in the event the Debtor seeks such an emergency hearing and the Court is unable to schedule such a hearing during the five (5) business day period described above, the Remedies Notice Period shall be tolled until the date on which the Court enters an order with respect to whether an Event of Default has occurred and/or is continuing. Unless the Court determines otherwise, the automatic stay shall automatically be terminated at the end of the Remedies Notice Period without further notice or order and the DIP Agent and the DIP Lenders shall be permitted to exercise all remedies set forth herein, in the DIP Credit Agreement, the DIP Loan Documents and as otherwise available at law against the DIP Collateral, without further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Agent and the DIP Lenders with respect thereto pursuant to the DIP Credit Agreement, the other DIP Loan Documents, or this Interim Order.

24.     Good Faith Under Sections 363 and 364 of the Bankruptcy Code; No Modification or Stay of this Interim Order. Each of the DIP Agent and the DIP Lenders has acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.

Based on the findings set forth in this Interim Order and the record made during the Interim Hearing, and in accordance with sections 363(m) and 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Interim Order are hereafter modified, amended or vacated by a subsequent order of the Court, or any other court, the DIP Agent and the DIP Lenders shall be and hereby are entitled to the protections provided in sections 363(m) and 364(e) of the Bankruptcy Code. Any such modification, amendment or vacatur shall not affect the validity and enforceability of any advances previously made, or lien, claim or priority authorized or created hereby, provided that this Interim Order was not stayed by court order after due notice had been given to the DIP Agent at the time the advances were made or the liens, claims or priorities were authorized and/or created. Any liens or claims granted to the DIP Agent and the DIP Lenders hereunder arising prior to the effective date of any such modification, amendment or vacatur of this Interim Order shall be governed in all respects by the original provisions of this Interim Order, including entitlement to all rights, remedies, privileges and benefits granted herein, provided that this Interim Order was not stayed by court order after due notice had been given to the DIP Agent and each of the DIP Lenders at the time the advances were made or the liens, claims or priorities were authorized and/or created.

25. <u>DIP and Other Expenses</u>. Upon compliance with the procedures set forth in this paragraph 25, the Debtor is authorized and directed to pay all reasonable and documented out-of-pocket expenses of the DIP Agent and the DIP Lenders in connection with the DIP Facility (including, without limitation, expenses incurred prior to the Petition Date), as provided in the DIP Loan Documents, including, without limitation, reasonable legal, accounting, collateral examination, monitoring and appraisal fees, financial advisory fees, fees and expenses of other consultants, and indemnification and reimbursement of fees and expenses, upon the Debtor's

receipt of summary copies of invoices for the payment thereof. Payment of all such fees and expenses shall not be subject to allowance by the Court and professionals for the DIP Agent and the DIP Lenders shall not be required to comply with the U.S. Trustee fee guidelines. Notwithstanding the foregoing, at the same time such summary copies of invoices (which shall not be required to contain time entries, but shall include a general, brief description of the nature of the matters for which services were performed, and which may be redacted or modified to the extent necessary to delete any information subject to the attorney-client privilege, any information constituting attorney work product, or any other confidential information, and the provision of such invoices shall not constitute any waiver of the attorney client privilege or of any benefits of the attorney work product doctrine) are delivered to the Debtor, the professionals for the DIP Agent and the DIP Lenders shall deliver a copy of their respective invoice summaries to the Statutory Trustee and the U.S. Trustee, redacted as necessary with respect to any privileged or confidential information contained therein. Any objections raised by the Debtor, the U.S. Trustee or the Statutory Trustee with respect to such invoice summaries within ten (10) days of the receipt thereof will be resolved by the Court or agreed among the parties. In the event of any objection that cannot otherwise be resolved consensually, the DIP Lenders shall have the right to request that the provisions of section 107 of the Bankruptcy Code and Rule 9018 of the Federal Rules of Bankruptcy Procedure shall apply to all or a portion of the materials relevant to the dispute. Pending such resolution, the undisputed portion of any such invoice summary will be paid promptly by the Debtor. Notwithstanding the foregoing, the Debtor is authorized and directed to pay on the Closing Date (as defined in the DIP Credit Agreement) all fees, costs and expenses of the DIP Agent and the DIP Lenders incurred on or prior to such date without the need for any

professional engaged by the DIP Agent or the DIP Lenders to first deliver a copy of its invoice as provided for herein.

26. <u>Indemnification</u>.

(a) The Debtor shall indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their shareholders, members, directors, agents, officers, subsidiaries and affiliates, successors and assigns, attorneys and professional advisors, in their respective capacities as such, from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Loan Documents, or the DIP Facility or the transactions contemplated thereby and by this Interim Order, as provided in and pursuant to the terms of the DIP Loan Documents and as further described therein and herein, or in connection with this Case, any plan, or any action or inaction by the Debtor, in each case except to the extent resulting from such indemnified party's gross negligence, willful misconduct, fraud or bad faith as finally determined by a final non-appealable order of a court of competent jurisdiction. The indemnity includes indemnification for the exercise of discretionary rights granted under the DIP Facility by the DIP Agent or the DIP Lenders. In all such litigation, or the preparation therefor, the DIP Agent and/or the DIP Lenders, as applicable, shall be entitled to select their own counsel and, in addition to the foregoing indemnity, the Debtor agrees to promptly advance and pay the reasonable fees and expenses of such counsel.

(b) Upon the earlier of the (i) payment in full in cash of the DIP Obligations and all bank product obligations having been cash collateralized in a manner and amount acceptable to the DIP Agent or (ii) conclusion of the Remedies Notice Period, the Debtor shall

deposit $100,000 into an indemnity account (the "Indemnity Account") subject to first priority liens of the DIP Agent, for the benefit of the DIP Lenders. The Indemnity Account shall be released and the funds applied in accordance with paragraph 16 of this Interim Order upon the indefeasible payment in full, in cash of the DIP Obligations and all bank product obligations having been cash collateralized in a manner and amount acceptable to the DIP Agent, and the receipt by the DIP Agent and each of the DIP Lenders of releases from the Debtor and its estate, with respect to any claims arising out of or related to the DIP Loan Documents, acceptable to the DIP Agent and each of the DIP Lenders, each in their sole discretion.

27. Proofs of Claim.

(a) Any order entered by the Court in relation to the establishment of a bar date for any claims (including without limitation administrative claims) in the Case or any Successor Case shall not apply to the DIP Agent or DIP Lenders. Neither DIP Agent nor any DIP Lender will be required to file proofs of claim or requests for approval of administrative expenses in the Case or any Successor Case, and the provisions of this Interim Order relating to the amount of the DIP Obligations and the DIP Superpriority Claim shall constitute timely filed proofs of claim and/or administrative expense requests.

28. Rights of Access and Information. Without limiting the rights of access and information afforded the DIP Agent and the DIP Lenders under the DIP Loan Documents, the Debtor shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Agent and DIP Lenders reasonable access to the Debtor's premises and its books and records in accordance with the DIP Loan Documents, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be reasonably requested. In addition, the Debtor authorizes its independent certified public accountants, financial advisors, investment

bankers and consultants to cooperate, consult with, and provide to the DIP Agent and the DIP Lenders all such information as may be reasonably requested with respect to the business, results of operations and financial condition of the Debtor.

29.     Carve Out.

(a)     *Carve Out*.  As used in this Interim Order, the "**Carve Out**" means, collectively, the following expenses: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930(a) and section 3717 of title 31 of the United States Code, and (ii) upon the occurrence of any Event of Default and delivery of a Carve Out Trigger Notice (as defined below), all allowed and unpaid professional fees and expenses of the Statutory Trustee and all allowed and unpaid professional fees and expenses of the Debtor's case professionals retained by the Debtor by final order of the Court (which order has not been reversed, vacated or stayed unless such stay is no longer effective) under sections 327 or 1103(a) of the Bankruptcy Code (such professionals collectively in this clause (ii), the "**Case Professionals**"), to the extent such fees and expenses are allowed and payable pursuant to an order of the Court (which order has not been reversed, vacated or stayed) ("**Allowed Professional Fees**"), irrespective of allowance date and incurred prior to the Carve Out Trigger Notice, which amount under this clause (ii) shall not exceed an aggregate $650,000 consisting of the initial Carve Out in the amount of $500,000 (the "**Initial Case Professional Carve Out**"), plus the addition of the supplemental Carve Out in the amount of $150,000 subject to the terms and conditions of Paragraph 29(b) herein (the "**Supplemental Case Professional Carve Out**," and together with the Initial Case Professional Carve Out, the "**Case Professional Carve Out**"), less, (x) commencing with the week ending [●], an aggregate amount per week limited to the amounts set forth in the Approved DIP Budget for the Case Professionals incurred prior to the delivery of

a written notice by the DIP Agent to the Debtor and its counsel, the Statutory Trustee and the U.S. Trustee, which notice may be delivered at any time by the DIP Agent (1) in connection with the repayment in full, in cash of the DIP Obligations and all letters of credit related thereto having been cancelled, backed, or cash collateralized in accordance with the terms thereof, and all bank product obligations having been cash collateralized in a manner and amount acceptable to the DIP Agent, or (2) at the option of the DIP Agent, in its sole discretion, following the occurrence and continuance of any Event of Default and, in any case, shall specify that it is a "Carve Out Trigger Notice" and may, at the option of the DIP Agent, expressly state that no additional loans under the DIP Credit Agreement may be requested to fund the Carve Out (a "**Carve-Out Trigger Notice**"), solely to the extent that such amounts described in this clause (x) are actually funded into the Professional Fee Account referred to below, and which amount shall be funded into a non-interest bearing account maintained at [●] (the "**Professional Fee Account**") on [Wednesday] of each week (or such other day of the week agreed to by the Debtor and the DIP Agent) in accordance with the Approved DIP Budget, provided, that (I) the Debtor has sufficient Excess Availability (as defined in the DIP Credit Agreement) on such date, (II) the Termination Declaration Date has not occurred; and (III) no Event of Default has occurred and is continuing.

(b)     *Availability of the Supplemental Case Professional Carve Out for Case Professionals*.  Notwithstanding anything to the contrary in this Interim Order or in the DIP Credit Agreement, and for purposes of the Supplemental Case Professional Carve Out only, the Supplemental Case Professional Carve Out shall be added to the Case Professional Carve Out and made immediately available to fund the Professional Fee Account pursuant to Paragraphs 29(a)(ii) and 29(c)-(e) of this Interim Order upon the indefeasible repayment on the effective date ("**Effective Date**") of the Debtor's Chapter 11 (Subchapter V) plan (the "**Chapter 11 Plan**") of

the DIP Obligations, exclusive of the Exit Fee as defined in the DIP Loan Documents (the "**Non-Exit Fee DIP Obligations**") as of such Effective Date (the "**Supplemental Case Professional Carve Out Trigger**"), *provided*, *however*, the Supplemental Case Professional Carve Out Trigger shall also be deemed to have immediately occurred in the event the DIP Facility is refinanced by an exit facility provided by Second Avenue Capital Partners LLC on the Effective Date of the Chapter 11 Plan in accordance with the DIP Credit Agreement. For the avoidance of doubt, the Supplemental Case Professional Carve Out shall at all times be junior to the Non-Exit Fee DIP Obligations until the indefeasible payment in full of the Non-Exit Fee DIP Loan Obligations.

(c)    *Professional Fee Account*.  No portion of the Carve Out, nor any Cash Collateral or proceeds of the DIP Collateral may be used in violation of this Interim Order or any Final Order. Notwithstanding anything to the contrary contained in this Interim Order, (A) until an Event of Default or the Termination Declaration Date has occurred, the Debtor shall be permitted to borrow under the DIP Credit Agreement on a weekly basis to fund the Professional Fee Account in the amounts contemplated under clause (x) of Paragraph 29(a) and Paragraph 29(b) above, subject to there being sufficient Excess Availability for such borrowings, (B) the Debtor shall be permitted to pay, from the Professional Fee Account, as and when the same may become due and payable, the Allowed Professional Fees of Case Professionals regardless of whether an Event of Default or the Termination Declaration Date has occurred, and (C) the aggregate amount of Allowed Professional Fees of Case Professionals paid by the Debtor prior to the delivery of a Carve-Out Trigger Notice from any amounts funded into the Professional Fee Account pursuant to clause (x) of Paragraph 29(a) and Paragraph 29(b) above (but not, for the avoidance of doubt, amounts paid from any retainers held by such Case Professionals) shall not exceed the amount of such Allowed Professional Fees set forth in the Approved DIP Budget and actually incurred up to

the date of the Carve Out Trigger Notice. None of the provisions of this Interim Order or any DIP Loan Document shall prohibit or restrict the payment of the fees and expenses of any Case Professional from any retainers held by such Case Professional. Any amount of the Case Professional Carve Out remaining after the payment in full of all Allowed Professional Fees of Case Professionals pursuant to final fee applications and orders in the Case shall be returned to the DIP Agent, which amounts shall be applied to the DIP Obligations in the order and manner required by the DIP Loan Documents. The DIP Liens shall attach to the Professional Fee Account subject to the payment of the Carve Out.

(d)     *Delivery of Weekly Fee Statements*. Not later than 5:00 p.m. Eastern time on Tuesday of each week starting with the second week following the Petition Date, each Case Professional shall deliver to the Debtor and the DIP Agent, a statement setting forth the amount and a description of the fees and expenses incurred during the preceding week by such professional Person (each such statement, a "**Weekly Statement**"). The Carve Out under Paragraph 29(a)(ii) above shall be limited to the Initial Case Professional Carve Out, as such may be augmented by the Supplemental Case Professional Carve Out pursuant to Paragraph 29(b) above, less the greater of (x) the aggregate unpaid amount of professional fees included in such Weekly Statements timely received by the DIP Agent prior to the Termination Declaration Date (as defined below), and (y) the aggregate unpaid amount of professional fees included in the Approved DIP Budget for the period prior to the Termination Declaration Date (such amount, the "**Professional Fee Carve Out Cap**"). For the avoidance of doubt, the DIP Agent shall at all times maintain a reserve in an amount not less than the sum of (i) the then outstanding amount of the Professional Fee Carve Out Cap (and such reserve shall include the Supplemental Case Professional Carve Out), *plus* (ii) the amounts contemplated under Paragraph 29(a)(i) above.

(e)    *Carve Out Reserves*.  On the day on which a Carve Out Trigger Notice is given by the DIP Agent to the Debtor with a copy to the Statutory Trustee (the "**Termination Declaration Date**"), the Carve Out Trigger Notice shall be deemed a draw request and notice of borrowing by the Debtor for DIP Loans under the DIP Credit Agreement in an amount equal to the sum of (x) the amounts set forth in Paragraph 29(a)(i) above incurred prior to the Termination Declaration Date, and (y) the then unpaid amounts of the Allowed Professional Fees up to the Professional Fee Carve Out Cap (any such amounts actually advanced shall constitute DIP Loans), and shall also constitute a demand to the Debtor to utilize all cash on hand as of such date and any available cash thereafter held by any Debtor to fund a reserve in an amount equal to the then unpaid amounts of the Allowed Professional Fees (which cash amounts shall reduce, on a dollar for dollar basis, the draw requests and applicable DIP Loans).  The Debtor shall deposit and hold such amounts in a segregated account at the DIP Agent in trust exclusively to pay such unpaid Allowed Professional Fees (the "**Carve Out Reserves**").  On the third business day following the Termination Declaration Date and the deemed requests for the making of DIP Loans as provided in this paragraph (e), notwithstanding anything in the DIP Credit Agreement to the contrary, including, without limitation, with respect to (1) the existence of a Default (as defined in the DIP Credit Agreement) or Event of Default, (2) the failure of the Debtor to satisfy any or all of the conditions precedent for the making of any DIP Loan under the DIP Credit Agreement, (3) any termination of the DIP Loan commitments following an Event of Default, or (4) the occurrence of the Maturity Date, each DIP Lender with an outstanding commitment shall make available to the DIP Agent such DIP Lender's *pro rata* share of such DIP Loans.  For the avoidance of doubt, the Carve Out Reserves shall constitute the primary source for payment of Allowed Professional Fees entitled to benefit from the Carve Out.

(f)     *No Direct Obligation to Pay Professional Fees.*  Except for funding the Professional Fee Account as provided herein, the DIP Agent and the DIP Lenders shall not be responsible for the funding, direct payment or reimbursement of any fees or disbursements of any Case Professionals incurred in connection with the Case or any Successor Case, except as necessary to fund the Carve Out.  Nothing in this Interim Order or otherwise shall be construed to obligate the DIP Agent the DIP Lenders in any way to pay compensation to or to reimburse expenses of any Case Professional, to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement, or as consent to the allowance of any particular professional fees or expense of any Case Professional. Nothing in this Interim Order or otherwise shall be construed to increase the Carve Out if actual Allowed Professional Fees of any Case Professional are higher in fact than the estimated fees and disbursements reflected in the Approved DIP Budget. For the avoidance of doubt, and except as provided in this Interim Order, until such time as the DIP Obligations have been indefeasibly paid in full in cash [or the DIP Facility is refinanced by an exit facility provided by Second Avenue Capital Partners LLC on the Effective Date of the Chapter 11 Plan,] (x) any fees or disbursements of any Case Professional shall be paid solely from the Professional Fee Account and any retainer, as applicable and [(y) no "success", "restructuring", "transaction" or similar fee shall be paid to the Debtor's investment banker or financial advisor].

(g)     *Payment of Carve Out*.  Upon the occurrence of the Termination Declaration Date, the DIP Obligations, the DIP Liens and the DIP Superpriority Claims shall be subject to the payment of the unfunded amount of the Carve Out.  The funding of the Carve Out shall be added to and made a part of the DIP Obligations and secured by the DIP Collateral and otherwise entitled to the protections granted under this Interim Order, the DIP Loan Documents, the Bankruptcy Code and applicable law. Upon funding of the Professional Fee Account in

accordance with the terms and conditions hereof, the DIP Agent and the DIP Lenders shall not have any further liability or responsibility with respect thereto.

30. <u>Limitations on the DIP Facility, the DIP Collateral, the Cash Collateral and the Carve Out</u>. Unless otherwise ordered by the Court after notice to the DIP Agent and a hearing, or consented to by the DIP Agent and the DIP Lenders, the DIP Facility, the DIP Collateral, the Cash Collateral and the Carve Out may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to or against the interests of the DIP Agent or the DIP Lenders or their rights and remedies under the DIP Loan Documents, or this Interim Order or the Final Order, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtor in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief, (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations, (iii) for monetary, injunctive or other affirmative relief against the DIP Agent, the DIP Lenders, or their respective collateral, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Agent or the DIP Lenders of any rights and remedies under this Interim Order or the Final Order, the DIP Loan Documents or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Agent or the DIP Lenders upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in any Chapter 11 Case; (c) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor; (e) objecting to,

contesting, or interfering with, in any way, the DIP Agent's or the DIP Lenders' enforcement or realization upon any of the DIP Collateral, as applicable, once an Event of Default has occurred, except as provided for in this Interim Order or Final Order, or seeking to prevent the DIP Agent from credit bidding in connection with any proposed plan or reorganization or liquidation or any proposed transaction pursuant to section 363 of the Bankruptcy Code; (f) using or seeking to use Cash Collateral while the DIP Obligations remain outstanding in a manner inconsistent with the Approved DIP Budget or this Interim Order; (g) using or seeking to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Agent and the DIP Lenders; (h) incurring indebtedness outside the ordinary course of business, except as permitted under the DIP Loan Documents; (i) objecting to or challenging in any way the claims, liens, or interests held by or on behalf of the DIP Agent, for the benefit of the DIP Lenders; (j) asserting, commencing or prosecuting any claims or causes of action whatsoever, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the DIP Agent or the DIP Lenders; or (k) prosecuting an objection to, contesting in any manner, or raising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, the DIP Liens or any other rights or interests of the DIP Agent or the DIP Lenders.

31. _Payment of Compensation_. Nothing herein shall be construed as a consent to the allowance of any professional fees or expenses of any Case Professionals or shall affect the right of the DIP Agent or any of the DIP Lenders to object to the allowance and payment of such fees and expenses.

32. _No Third Party Rights_. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

33.     Section 506(c) Claims.  Subject to entry of the Final Order granting the relief provided in this paragraph, no costs or expenses of administration which have been or may be incurred in the Case at any time shall be charged against the DIP Agent, the DIP Lenders or the DIP Collateral, pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise.

34.     No Marshaling/Applications of Proceeds.  Subject to the entry of the Final Order granting the relief provided in this paragraph, neither the DIP Agent nor the DIP Lenders shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

35.     Section 552(b).  The DIP Agent and the DIP Lenders shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code.

36.     Discharge Waiver.  The Debtor expressly stipulates, and the Court finds and adjudicates that, none of the DIP Obligations, the DIP Superpriority Claim or the DIP Liens shall be discharged by the entry of an order confirming any plan of reorganization or unless the DIP Agent and DIP Lenders have consented to other treatment of the DIP Obligations in a confirmed plan of reorganization, unless the DIP Obligations have been paid in full in cash on or before the effective date of a confirmed plan of reorganization. The Debtor shall not propose or support any plan or sale of all or substantially all of the Debtor's assets or entry of any confirmation order or sale order that is not conditioned upon the payment in full in cash, on the effective date of such plan of all DIP Obligations, unless the DIP Agent and DIP Lenders have approved of an alternate treatment prior to the filing of any plan of reorganization.

37.     Rights Preserved.  Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly:  (a) the DIP Agent's or the DIP Lenders' right to seek any other or supplemental relief

in respect of the Debtor; or (b) any of the rights of the DIP Agent or the DIP Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Case or Successor Case, conversion of the Case to a case under Chapter 7, or appointment of a Chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a Chapter 11 plan or plans. Other than as expressly set forth in this Interim Order, any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Agent, the DIP Lenders and the Debtor is preserved.

38. <u>No Waiver by Failure to Seek Relief</u>. The failure of the DIP Agent or the DIP Lenders to seek relief or otherwise exercise rights and remedies under this Interim Order, the DIP Loan Documents or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise of the DIP Agent or the DIP Lenders.

39. <u>Binding Effect of Interim Order</u>. Immediately upon entry by the Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Interim Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Agent, the DIP Lenders, all other creditors of the Debtor, any court appointed committee (if appointed), and all other parties in interest and their respective successors and assigns, including any Trustee or other fiduciary hereafter appointed in the Case, any Successor Case, or upon dismissal of the Case or any Successor Case. Notwithstanding anything contained herein with respect to obligations or limitations when a Final Order is entered, the terms of the Final Order shall be what is binding on all parties.

40. <u>No Modification of Interim Order</u>. Until and unless the DIP Obligations have been paid in full in cash (such payment being without prejudice to any terms or provisions contained in

the DIP Facility which survive such discharge by their terms), and all commitments to extend credit under the DIP Facility have been terminated, the Debtor irrevocably waive any right to seek any amendment, modification or extension of this Interim Order without the prior written consent of each of the DIP Agent and the DIP Lenders, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Agent and the DIP Lenders.

41.     Interim Order Controls.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents or this Interim Order, the provisions of this Interim Order shall govern and control.

42.     Survival.  The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order which may be entered:  (a) confirming any plan of reorganization in any Case; (b) converting a Case to a case under Chapter 7 of the Bankruptcy Code; (c) dismissing the Case or any Successor Case; or (d) pursuant to which the Court abstains from hearing the Case or any Successor Case.  The terms and provisions of this Interim Order, including the claims, liens, security interests and other protections granted to the DIP Agent and DIP Lenders pursuant to this Interim Order and/or the DIP Loan Documents, notwithstanding the entry of any such order, shall continue in the Case, in any Successor Case, or following dismissal of the Case or any Successor Case, and shall maintain priority as provided by this Interim Order until all DIP Obligations have been paid in full in cash and all commitments to extend credit under the DIP Facility are terminated.  The terms and provisions concerning the indemnification of the DIP Agent and the DIP Lenders shall continue in the Case and in any Successor Case, following dismissal of the Case or any Successor Case, following termination of the DIP Loan Documents and/or the repayment of the DIP Obligations.

43. <u>Final Hearing</u>. The Final Hearing on the DIP Motion shall be held on [●], 2021, at [●], prevailing Eastern Time. Any objections or responses to entry of the Final Order on the DIP Motion shall be filed on or before 4:00 p.m., prevailing Eastern Time, on [●], 2021, and shall be served on: (a) the Debtor, Solstice Marketing Concepts LLC c/o KCP Advisory Group LLC, 700 Technology Park Drive, Suite 212, Billerica, MA 01821, Attn: Jacen A. Dinoff; (b) proposed counsel to the Debtor, Morgan, Lewis & Bockius LLP, 101 Park Avenue, New York, New York 10178-0060, Attn: Craig A. Wolfe (craig.wolfe@morganlewis.com); (c) counsel to Second Avenue Capital Partners LLC, as administrative agent and collateral agent for the Debtor's debtor-in-possession credit facility, Choate, Hall & Stewart LLP, Two International Place, Boston, MA 02110, Attn: John F. Ventola (jventola@choate.com); (d) the Subchapter V trustee, LaMonica Herbst & Maniscalco LLP, 3305 Jerusalem Avenue, Wantagh, New York 11793, Attn: Salvatore LaMonica (sl@lhmlawfirm.com); and (e) Office of the United States Trustee, 201 Varick Street, Room 1006, New York, New York 10014, Attn: Susan A. Arbeit (susan.arbeit@usdoj.gov). In the event no objections to entry of a final order on the DIP Motion are timely received, this Court may enter such final order without need for the Final Hearing.

44. <u>Effect of this Interim Order</u>. This Interim Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect immediately, notwithstanding anything to the contrary proscribed by applicable law.

45. <u>Retention of Jurisdiction</u>. The Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

46. <u>Parent Guaranty</u>. Fairway LLC (the "**Parent**") is the non-debtor parent company of the Debtor. In accordance with the terms of conditions of the DIP Credit Agreement, the Parent has agreed to unconditionally guaranty the DIP Obligations. This Court shall have jurisdiction

over any dispute among the Parent, the Debtor, the DIP Agent and/or the DIP Lenders in connection of the guaranty of the Parent.

Dated:_____
        New York, NY

_____
THE HONORABLE MARTIN GLENN
UNITED STATES BANKRUPTCY JUDGE

# **EXHIBIT 1**

**DIP Term Sheet**

**[Substantially Completed Form Pending Finalization and Execution]**

# SUMMARY OF INDICATIVE TERMS AND CONDITIONS ("TERM SHEET")
## $6,500,000 SENIOR SECURED SUPER-PRIORITY
## DEBTOR-IN-POSSESSION ABL CREDIT FACILITY

This Term Sheet is a binding agreement by the DIP ABL Lenders (as defined below) with respect to the DIP ABL Commitments (as defined below) to provide the DIP ABL Loans (as defined below). Such obligation of the DIP ABL Lenders to provide the DIP ABL Commitments and the DIP ABL Loans pursuant to this Term Sheet is conditioned upon the execution and delivery of signature pages to this Term Sheet by each of the DIP ABL Lenders and the Loan Parties (as defined below) and shall be subject to the terms and conditions set forth in this Term Sheet and the DIP ABL Credit Facility Documentation (as defined below). This Term Sheet is qualified in all respects by the Interim DIP Order (as defined below), to which this Term Sheet shall be attached as Exhibit A, and therefore, to the extent that any provision of this Term Sheet conflicts with the terms of the Interim DIP Order, the Interim DIP Order shall control.

*Capitalized terms not otherwise defined in this Term Sheet have the same meanings as specified therefor in the Interim DIP Order.*

Dated as of February [●], 2021

| | |
|---|---|
| **BORROWER:** | Solstice Marketing Concepts LLC, a Delaware limited liability company and a debtor-in-possession in the Case referred to below (the "***Borrower***"). |
| **GUARANTOR:** | Fairway LLC, a Nevada limited liability company (the "***Guarantor***", and together with the Borrower, collectively, the "***Loan Parties***" and each individually, a "***Loan Party***") hereby irrevocably and unconditionally guarantees, as a primary obligor and not merely as a surety, the due and punctual payment when due (whether at the stated maturity, by required prepayment, by acceleration or otherwise) and performance by the Borrower of all obligations of the Borrower under the DIP ABL Credit Facility (collectively, the "***Guaranteed Obligations***"). This guarantee is a guarantee of payment and not of collection. The Guarantor agrees that the Guaranteed Obligations may be extended or renewed, in whole or in part, increased, or otherwise modified from time to time, without notice to or further assent from it, and that it will remain bound upon this guarantee notwithstanding any extension, renewal, increase or other modification of any of the Guaranteed Obligations. To the fullest extent permitted by applicable law, the Guarantor hereby waives any and all defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties. Upon payment by the Guarantor of any sums to any DIP ABL Secured Party as provided herein, all rights of the Guarantor against the Borrower arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and junior in right of payment to the prior payment in full in cash of all the Guaranteed Obligations and termination or expiration of the DIP ABL Commitments (as defined below). In addition, |

notwithstanding anything to the contrary contained in this guarantee, the Guarantor may not exercise any rights of subrogation, contribution, reimbursement, indemnity or other similar rights against, and may not proceed or seek recourse against or with respect to any property or asset of, the Borrower, including after payment in full in cash of all the Guaranteed Obligations and termination or expiration of the DIP ABL Commitments, if all or any portion of the Guaranteed Obligations have been satisfied in connection with an exercise of remedies in respect of the equity interests of the Borrower, whether pursuant to this Term Sheet, the DIP ABL Credit Facility Documentation or otherwise.

As collateral security for the payment and performance in full of all the Guaranteed Obligations, the Guarantor hereby pledges and grants to the DIP ABL Agent for its benefit and for the benefit of the other DIP ABL Secured Parties, a lien on and security interest in all of the right, title and interest of the Guarantor in, to and under the Collateral (as defined below), wherever located, and whether now existing or hereafter arising or acquired from time to time, including, without limitation, all accounts; all goods (including, without limitation, equipment, inventory and fixtures); all documents, instruments and chattel paper; all letters of credit and letter-of-credit rights; all securities collateral; all investment property; all intellectual property collateral; all commercial tort claims; all general intangibles (including, without limitation, all payment intangibles); all deposit accounts, money, cash and cash equivalents; all supporting obligations; all books and records relating to the Collateral; all proceeds and products of each of the foregoing and all accessions to, substitutions and replacements for, and rents, profits and products of, each of the foregoing (with each such category of Collateral having the definition provided in the Uniform Commercial Code as enacted in the State of New York, to the extent defined therein). The Guarantor hereby irrevocably authorizes the DIP ABL Agent at any time and from time to time to authenticate and file in any relevant jurisdiction any financing statements (including fixture filings) and amendments thereto that contain the information required by Article 9 of the Uniform Commercial Code of each applicable jurisdiction for the filing of any financing statement or amendment relating to the Collateral, including, without limitation, (i) whether the Guarantor is an organization, the type of organization and any organizational identification number issued to the Guarantor, (ii) a description of the Collateral as "all assets of the Debtor, wherever located, whether now owned or hereafter acquired or arising" (or words of similar effect), or as otherwise may be required under applicable law and (iii) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Collateral relates.

Upon the occurrence and during the continuance of any event of default hereunder, the DIP ABL Agent may exercise all the rights and remedies of a secured party under applicable law, including the Uniform Commercial Code as enacted in the State of New York.

| | |
|---|---|
| **ADMINISTRATIVE AGENT:** | Second Avenue Capital Partners LLC ("***Second Avenue***") will act as administrative agent and collateral agent (in such capacities, the "***DIP ABL Agent***"), and will perform the duties customarily associated with such roles. |
| **DIP ABL LENDERS:** | Second Avenue and/or its affiliates shall provide 100% of the DIP ABL Commitments (the "***DIP ABL Lenders***"). |
| **INSOLVENCY PROCEEDING:** | The Borrower is a debtor and a debtor-in-possession in a bankruptcy case filed under Subchapter V (11 U.S.C. §§ 1181-1195) ("***Subchapter V***") of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "***Bankruptcy Code***") on February 17, 2021, (the "***Petition Date***") in the United States Bankruptcy Court for the Southern District of New York (the "***Bankruptcy Court***") (the "***Case***"). |
| **DIP ABL CREDIT FACILITY:** | Subject to the terms under the heading "Borrowing Base," a senior secured asset-based credit facility to the Borrower (the "***DIP ABL Credit Facility***") in an aggregate principal amount of up to the lesser of (i) $6,500,000 consisting entirely of revolving commitments (the "***DIP ABL Commitments***", and the loans outstanding thereunder from time to time, the "***DIP ABL Loans***"), and (ii) the amount provided therefor in the Interim DIP Order (as defined on <u>Addendum III</u> attached hereto) (*i.e.*, $2,000,000) or the Final DIP Order (as defined on <u>Addendum II</u> attached hereto), whichever is then in effect (the "***Applicable DIP Order***"), available from time to time until the Maturity Date (as defined below). |
| **USE OF PROCEEDS:** | The proceeds of the DIP ABL Credit Facility shall be used solely for the following purposes, in each case in a manner consistent with the terms and conditions set forth in this Term Sheet and consistent with the Approved DIP Budget (as defined below) (subject to the Permitted Variances (as defined below)): (i) for payment of professional fees and other costs of administering the Case, (ii) for payment of Bankruptcy Court approved pre-petition obligations of the Borrower consistent with the Approved DIP Budget (subject to the Permitted Variances) or otherwise approved by the DIP ABL Agent and the DIP ABL Lenders, and (iii) for working capital and other general corporate purposes of the Borrower consistent with the Approved DIP Budget (subject to the Permitted Variances) and the terms of the DIP ABL Credit Facility. |
| **BORROWING BASE:** | Advances under the DIP ABL Credit Facility in respect of the DIP ABL Commitments shall be subject to compliance with the following borrowing base (the "***Borrowing Base***") equal to the result of:<br><br>(i) the net amount of eligible U.S. credit card receivables, <u>multiplied by</u> 95%, <u>plus</u><br><br>(ii) the net orderly liquidation value of the aggregate cost of eligible U.S. inventory, <u>multiplied by</u> 95%, <u>minus</u><br><br>(iii) any applicable Reserves (as defined below), including a mandatory Reserve in respect of the Carve Out, <u>minus</u> |

(iv) the Availability Block (as defined below).

The DIP ABL Agent shall have the right to establish or modify eligibility criteria in the exercise of reasonable business judgment from the perspective of a secured commercial lender in a debtor-in-possession credit facility of this size, type and purpose ("***Permitted Discretion***"). Without limiting the foregoing, inventory at closed store locations shall be excluded from the Borrowing Base, unless and until (a) the DIP ABL Agent otherwise agrees in its sole discretion or (b) it is relocated to an open store.

As used in this Term Sheet, "***Availability Block***" means $700,000.

As used in this Term Sheet, "***DIP ABL Loan Cap***" means, at any time of determination, the lesser of (a) the sum of the aggregate DIP ABL Commitments and (b) the Borrowing Base at such time.

As used in this Term Sheet, "***Excess Availability***" means, at any time of determination by the DIP ABL Agent, the result, if a positive number, of (a) the DIP ABL Loan Cap at such time, minus (b) the total amount of DIP ABL Loans outstanding under the DIP ABL Credit Facility at such time.

RESERVES:

The DIP ABL Agent shall have the right to establish, modify or eliminate reserves ("***Reserves***") in its Permitted Discretion, including, without limitation, Reserves in respect of (i) inventory at certain leased locations and (ii) the Carve Out, in each case, as described below.

LEASE RESERVES:

Without limiting the foregoing, the DIP ABL Agent shall have the right to implement Reserves in its Permitted Discretion in respect of (i) inventory located at any leased retail location projected by the Borrower to be closed with respect to which the lease is or is projected by the Borrower to be terminated or rejected by the Borrower, or (ii) inventory located at any leased retail location with respect to which the lease has not been assumed as of the Lease Assumption Reserve Commencement Date (as defined below), in such case in an amount determined by the DIP ABL Agent in its Permitted Discretion.

"***Lease Assumption Reserve Commencement Date***": The date that is twelve (12) weeks prior to the end of the 120-day lease rejection/assumption period under Section 365(d)(4) of the Bankruptcy Code or such longer or shorter period that is established by the Bankruptcy Court for such purpose pursuant to Section 365(d)(4) of the Bankruptcy Code.

CARVE OUT:

The Interim DIP Order and the Final DIP Order shall include the Carve Out (as defined in the Interim DIP Order).

No portion of the Carve Out or any cash Collateral (as defined below) may be used to litigate, object to, contest or challenge in any manner or

raise any defenses to the debt or collateral position of the DIP ABL Agent, the DIP ABL Lenders and the other secured parties (collectively, the "***DIP ABL Secured Parties***") under the DIP ABL Credit Facility, whether by challenging the validity, extent, amount, perfection, priority or enforceability of the DIP ABL Facility Obligations (as defined below) or the validity, extent, perfection, priority or enforceability of any mortgage, security interest or lien with respect thereto or any other rights or interests of the DIP ABL Secured Parties with respect thereto, or by seeking to subordinate or re-characterize the DIP ABL Facility Obligations or to disallow or avoid any claim, mortgage, security interest or lien or payment thereunder or by asserting any claims or causes of action, including, without limitation, any actions under Chapter 5 of the Bankruptcy Code, against the DIP ABL Secured Parties or any of their respective Related Parties (as defined below).

In addition, neither the Carve Out nor any cash Collateral shall be used in connection with (i) preventing, hindering or delaying the DIP ABL Secured Parties' enforcement or realization upon the Collateral once an event of default has occurred and is continuing, (ii) using or seeking to use cash Collateral or selling or otherwise disposing of the Collateral without the consent of the DIP ABL Agent in its sole discretion, (iii) using or seeking to use any insurance proceeds related to the Collateral without the consent of the DIP ABL Agent in its sole discretion, or (iv) incurring indebtedness other than consistent with the Approved DIP Budget or other than as permitted in the DIP ABL Credit Facility Documentation.

**CLOSING DATE:**     The closing and the initial extension of credit under the DIP ABL Credit Facility (the "***Closing Date***") shall occur as promptly as is practical after the entry of the Interim DIP Order by the Bankruptcy Court, subject to the conditions precedent set forth below under the heading "Conditions Precedent to Closing".

**MATURITY:**     That date (the "***Maturity Date***") which is the earliest to occur of (a) June 30, 2021, (b) the effective date of a plan of reorganization, (c) the date of consummation of a sale of all or substantially all of the Borrower's assets under Section 363 of the Bankruptcy Code and (d) the Termination Declaration Date (as defined below). All amounts outstanding under the DIP ABL Credit Facility shall be due and payable in full on the Maturity Date.

**APPLICATION OF PROCEEDS**:

Subject to the Applicable DIP Order, the obligations under the DIP ABL Credit Facility (the "***DIP ABL Facility Obligations***") shall be reduced from the net proceeds of Collateral received by the DIP ABL Agent and all proceeds realized from the Loan Parties on account of the Collateral (whether pursuant to cash dominion or arising from realization on Collateral, setoff or otherwise).

If an event of default has occurred and is continuing, subject to the Applicable DIP Order, at the DIP ABL Agent's election, all proceeds of Collateral shall be applied as follows:

<u>First</u>, to pay reasonable fees, costs, expenses, and other amounts due to the DIP ABL Agent;

<u>Second</u>, to pay accrued interest, fees and outstanding principal in respect of the DIP ABL Loans, and to pay any other amounts in respect of the DIP ABL Commitments; and

<u>Third</u>, to pay any other outstanding DIP ABL Facility Obligations.

Notwithstanding the foregoing, proceeds may be required to provide cash collateral for indemnity reserves and other contingent obligations on the terms and conditions to be agreed in the Applicable DIP Order or the DIP ABL Credit Agreement (as defined below).

**BUDGET**:

The use of borrowings under the DIP ABL Credit Facility and use of cash Collateral shall be consistent with the Approved DIP Budget, subject to the Permitted Variances.

The Borrower will prepare and deliver a thirteen (13) week cash flow forecast (with a week being deemed to end on Saturday), in form and substance acceptable to the DIP ABL Agent in its sole discretion (the "***Initial DIP Budget***"), and attached to this Term Sheet as <u>Exhibit A</u>, depicting on a weekly basis cash revenues, receipts, expenses, professional fees and other disbursements (including, without limitation, any payments with respect to real property leases), net cash flows, gross margin, inventory receipts and levels, Borrowing Base and Excess Availability amounts, total available liquidity, and other items on a line item basis (including all necessary and required expenses that the Borrower expects to incur and anticipated uses of proceeds of draws under the DIP ABL Credit Facility) on a line item basis for the period beginning as of the week of the Petition Date through and including the thirteenth (13th) week after such week, with a break-out for stores being closed or proposed to be closed, as such cash flow forecast may be amended, supplemented or modified from time to time by the Borrower (and/or at the request of the DIP ABL Agent from time to time) only with the prior written consent of the DIP ABL Agent in its sole discretion. Once so approved by the DIP ABL Agent, the Initial DIP Budget shall be deemed the "***Approved DIP Budget***" for all purposes of the DIP ABL Credit Facility until superseded by any Updated DIP

Budget (as defined below) that subsequently is approved in writing by the DIP ABL Agent in its sole discretion; *provided* that, solely for purposes of preparing the Variance Report and calculating the DIP Budget Covenant (each as defined below), the "Approved DIP Budget" for the initial thirteen (13) week period covered by the Initial DIP Budget shall be deemed to be the Initial DIP Budget, unless otherwise approved in writing by the DIP ABL Agent in its sole discretion for such purposes.

By 5:00 p.m., Eastern time, on Wednesday of each calendar week following the week of the Petition Date, the Borrower shall deliver to the DIP ABL Agent a supplement to the Initial DIP Budget (or the previously supplemented Approved DIP Budget, as the case may be), covering the subsequent thirteen (13) week period that commences with the week immediately following the date of delivery of the supplemental budget, consistent with the form and level of detail set forth in the Initial DIP Budget and otherwise in form and substance acceptable to the DIP ABL Agent in its sole discretion (each such supplemental budget, an "***Updated DIP Budget***").  Upon (and subject to) the approval in writing of any such Updated DIP Budget by the DIP ABL Agent in its sole discretion, such Updated DIP Budget shall constitute the then-approved Approved DIP Budget.

On Wednesday of each calendar week, commencing with the Wednesday following the first full calendar week following the Petition Date (or the Wednesday following the week of the Petition Date, if the Petition Date falls on Sunday, Monday, Tuesday or Wednesday), by 5:00 p.m., Eastern time, on such Wednesday (each such Wednesday, a "***Variance Report Date***"), the Borrower shall deliver to the DIP ABL Agent a variance report (each, a "***Variance Report***") for the applicable Testing Period setting forth, in reasonable detail, any differences between (i) actual cash receipts on an aggregate basis for such Testing Period compared to projected cash receipts on an aggregate basis as set forth in the Approved DIP Budget for such Testing Period (any such difference, the "***Cash Receipts Variance***"), (ii) actual cash disbursements on an aggregate basis for such Testing Period compared to projected cash disbursements on an aggregate basis as set forth in the Approved DIP Budget for such Testing Period (any such difference, the "***Disbursements Variance***"), (iii) actual Excess Availability as of the last day of such Testing Period compared to projected Excess Availability as set forth in the Approved DIP Budget as of the last day of such Testing Period (any such difference, the "***Excess Availability Variance***"), (iv) actual inventory receipts on an aggregate basis for such Testing Period compared to projected inventory receipts on an aggregate basis as set forth in the Approved DIP Budget for such Testing Period (any such difference, the "***Inventory Receipts Variance***"), and (v) actual gross margin (defined as gross profit as a percentage of revenue, with such amounts determined in accordance with GAAP or another manner acceptable to the DIP ABL Agent) for such Testing Period compared to projected gross margin as set forth in the Approved DIP Budget for such Testing Period (any such difference, the "***Gross Margin Variance***"), together with a statement from the Borrower's chief restructuring officer certifying the information contained in such

Variance Report. The Variance Report shall also provide a reasonably detailed explanation for any variance. In addition, for informational purposes only, and not for purposes of approval or variance testing, each Variance Report for the applicable Testing Period shall also set forth, in reasonable detail, any differences between (i) actual cash receipts on a line-item basis for all categories shown in the Approved DIP Budget for such Testing Period compared to projected cash receipts on a line-item basis as set forth in the Approved DIP Budget for such Testing Period and (ii) actual cash disbursements on a line-item basis for all categories shown in the Approved DIP Budget for such Testing Period compared to projected cash disbursements on a line-item basis as set forth in the Approved DIP Budget for such Testing Period. The term "**_Testing Period_**" means, with respect to each Variance Report required to be delivered, on a Variance Report Date, the three (3) week period ending on the Saturday immediately prior to such Variance Report Date (or, if such period is shorter than three (3) weeks, the portion of such period beginning on the Petition Date).

In addition, there shall be a weekly teleconference between the Borrower and the DIP ABL Secured Parties (and their advisors) to discuss the Variance Report, the Case, the financial and operational performance of the Borrower, and such other related matters as may be requested by the DIP ABL Secured Parties.

The reporting, information delivery and other requirements in this section are referred to collectively as the "**_Budget Reporting Requirements_**".

**DIP BUDGET COVENANT**:    The Borrower shall not permit (i) the Cash Receipts Variance for any Testing Period to have a negative variance in excess of 15% (with negative variance meaning, for the avoidance of doubt, that actual receipts are less than projected receipts) for any three (3) week period and 25% if such period is shorter than three (3) weeks, (ii) a Disbursements Variance for any Testing Period to have a negative variance in excess of 15% (with negative variance meaning, for the avoidance of doubt, that actual disbursements are greater than projected disbursements) for any three (3) week period and 25% if such period is shorter than three (3) weeks, (iii) an Excess Availability Variance as of the last day of any Testing Period to have a negative variance in excess of 15% (with negative variance meaning, for the avoidance of doubt, that actual Excess Availability is less than projected Excess Availability) for any three (3) week period and 25% if such period is shorter than three (3) weeks, (iv) the Inventory Receipts Variance for any Testing Period to have a negative variance in excess of 15% (with negative variance meaning, for the avoidance of doubt, that actual receipts are less than projected receipts) for any three (3) week period and 25% if such period is shorter than three (3) weeks, or (v) the Gross Margin Variance for any Testing Period to have a negative variance in excess of five (5) percentage points (with negative variance meaning, for the avoidance of doubt, that actual gross margin is less than projected gross margin) for any three (3) week period and seven and one-half (7.5) percentage points

if such period is shorter than three (3) weeks (such permitted variances, the "**_Permitted Variances_**" and such limitations, the "**_DIP Budget Covenant_**").  The DIP Budget Covenant shall be tested on each Variance Report Date, with respect to the Testing Period ending immediately prior to such Variance Report Date.

**SECURITY:** Subject to the Carve Out (to the extent provided in the Applicable DIP Order), the DIP ABL Credit Facility and the DIP ABL Facility Obligations thereunder (a) will be entitled to super priority claim status pursuant to Section 364(c)(1) of the Bankruptcy Code and (b) will be secured by a fully perfected security interest (in the case of the Borrower, pursuant to Section 364(c)(2), Section 364(c)(3) and Section 364(d)(1) of the Bankruptcy Code) in all property and assets of the Loan Parties including, without limitation, the proceeds of any avoidance actions brought under Chapter 5 of the Bankruptcy Code or applicable state law equivalents, and subject to the entry of a Final DIP Order, the Borrower's rights under Section 506(c) of the Bankruptcy Code (collectively, the "**_Collateral_**").

Subject to the entry of the Final DIP Order, (a) the DIP ABL Secured Parties shall each be entitled to a waiver of any "equities of the case" exception under Section 552(b) of the Bankruptcy Code, and (b) the DIP ABL Secured Parties shall each be entitled to a waiver of the provisions of Section 506(c) of the Bankruptcy Code.

All such superpriority claims, security interests and liens will survive any conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, or the dismissal of the Case.

**CASH MANAGEMENT:** The Loan Parties shall establish or maintain, as the case may be, cash management procedures acceptable to the DIP ABL Agent.  Subject to exceptions to be mutually agreed, all deposit accounts and securities accounts of the Loan Parties shall be subject to control agreements in favor of the DIP ABL Agent (such accounts subject to the control of such DIP ABL Agent, collectively, the "**_Blocked Accounts_**").  The DIP ABL Agent shall have control over all relevant Blocked Accounts pursuant to account control agreements in form and substance satisfactory to the DIP ABL Agent, and the Loan Parties shall cause all amounts maintained in deposit accounts (that are or are required to become Blocked Accounts) to be swept, on a daily basis, to a collection account of the DIP ABL Agent, to be applied to the DIP ABL Facility Obligations.  The Loan Parties shall transfer all cash to the Blocked Accounts (subject to exceptions to be mutually agreed).

**DOCUMENTATION:** Within the timeframe set forth on <u>Addendum II</u> attached hereto, the Loan Parties shall enter into a debtor-in-possession credit agreement (the "**_DIP ABL Credit Agreement_**"), collateral and guarantee documents and other documents to be executed or delivered in connection therewith (including, without limitation, account control agreements with respect to Blocked Accounts), in each case, consistent with the terms and conditions of this Term Sheet and containing representations and

warranties, additional covenants, additional events of default and other provisions appropriate for debtor-in-possession credit facilities of this size, type and purpose acceptable to the DIP ABL Agent (the "***DIP ABL Credit Facility Documentation***"). All orders of the Bankruptcy Court approving, authorizing, or amending the DIP ABL Credit Facility, and all motions relating thereto, shall be in form and substance acceptable to the DIP ABL Agent in its sole discretion.

**COLLATERAL UPDATES:** The DIP ABL Agent shall be entitled to receive, upon request from time to time, (i) collateral valuation updates from any liquidation agent and (ii) collateral appraisal updates from an appraiser acceptable to the DIP ABL Agent in its sole discretion, including reviews of inventory levels and mix. The Borrower shall cooperate with and provide such liquidation agents, advisors, and appraisers with updated information as may be requested by them from time to time.

**MILESTONES**: The Borrower shall comply with each of the Required Milestones set forth on Addendum II attached hereto.

**CONDITIONS PRECEDENT TO CLOSING:** The closing and the initial extension of credit under the DIP ABL Credit Facility will be subject to satisfaction of the conditions precedent set forth on Addendum III attached hereto.

**CONDITIONS PRECEDENT TO ALL EXTENSIONS OF CREDIT:** (a) The Applicable DIP Order and the cash management order, shall be in full force and effect, and shall not have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification, amendment or stay pending appeal, in a manner, or relating to a matter, that is adverse to the interests of the DIP ABL Secured Parties;

(b) satisfaction by the Borrower of all applicable Required Milestones that are required to have occurred as of each drawing date;

(c) the absence of any default or event of default in respect of the DIP ABL Credit Facility, including, without limitation, compliance with DIP Budget Covenant as of the most recent applicable Variance Report Date;

(d) the representations and warranties under the DIP ABL Credit Facility shall be true and correct in all material respects;

(e) the DIP ABL Agent, on behalf of itself and the DIP ABL Lenders, shall have valid, binding, enforceable, non-avoidable, and automatically and fully and properly perfected liens on, and security interests in, the Collateral, in each case, having the priorities set forth in the Applicable DIP Order, and subject only to the payment in full in cash of any amounts due under the Carve Out (to the extent provided in the Applicable DIP Order);

(f) the Borrower shall have paid the balance of all fees and expenses then due and payable to the DIP ABL Secured Parties;

(g) the making of such extension of credit will not violate any requirement of material law and shall not be enjoined, temporarily, preliminarily or permanently; and

(h) the Borrower shall have delivered to the DIP ABL Agent a notice of borrowing in form and detail acceptable to the DIP ABL Agent, duly executed by the chief restructuring officer of the Borrower.

**REPRESENTATIONS AND WARRANTIES:**

Usual and customary representations and warranties for debtor-in-possession credit facilities of this size, type and purpose, which shall be acceptable to the DIP ABL Agent.

**AFFIRMATIVE AND NEGATIVE COVENANTS:**

Usual and customary affirmative and negative covenants for debtor-in-possession credit facilities of this size, type and purpose, which shall be acceptable to the DIP ABL Agent, including, without limitation:

Affirmative Covenants

(a) The Borrower shall deliver to the DIP ABL Agent, not later than 5:00 p.m., Eastern time, on Tuesday of each calendar week, (i) a certificate (the "***Borrowing Base Certificate***") presenting the Borrower's computation of the Borrowing Base, computed by the Borrower as of the close of business on the immediately preceding Saturday, with such weekly Borrowing Base Certificates updated for purchases and sales of Inventory from the prior week in a manner approved by the DIP ABL Agent, and (ii) an inventory roll forward.

(b) The Borrower shall deliver to the DIP ABL Agent, together with delivery of the Borrowing Base Certificate, (i) accounts receivables agings and accounts payable agings (including summary of both pre-petition and post-petition accounts payable), (ii) an accounts payable and accrual report, in form and substance satisfactory to the DIP ABL Agent, and (iii) a summary of inventory by location and type with a supporting perpetual inventory report, in form and substance satisfactory to the DIP ABL Agent with detail sufficient to permit the preparation of an updated inventory appraisal, and such other reports as requested by the DIP ABL Agent; and

(c) The DIP ABL Agent shall be permitted to conduct one (1) field examination and one (1) inventory appraisal (at the expense of the Borrower) during the term of the DIP ABL Credit Facility, and additional field examinations and inventory appraisals during the continuance of an event of default (at the expense of the Borrower). The Borrower shall cooperate with and provide such liquidation agents, advisors (including the Debtor's Advisors and the Agent's Advisor (as

defined below)), appraisers and the DIP ABL Agent with updated information as may be requested by them from time to time.

<u>Negative Covenants</u>

Each of the Loan Parties (with respect to itself and each of its subsidiaries) agrees, after the Closing Date until the execution and delivery of the DIP ABL Credit Agreement, not to:

(i) incur any indebtedness for borrowed money without the prior written consent of the DIP ABL Agent;

(ii) create or permit to exist any liens or encumbrances on any assets, other than liens securing the DIP ABL Credit Facility and any other permitted liens acceptable to the DIP ABL Agent;

(iii) create or permit to exist any other superpriority claim which is pari passu with or senior to the claims of the DIP ABL Secured Parties under the DIP ABL Credit Facility, except for the Carve Out (to the extent provided in the Applicable DIP Order);

(iv) sell or otherwise dispose of any assets (other than such ordinary course dispositions necessary for the operation of the Borrower's business during the Case, in each case, in accordance with the Approved DIP Budget) or abandon any inventory without the prior written consent of the DIP ABL Agent;

(v) modify or alter (i) in any material manner the nature and type of its business or the manner in which such business is conducted or (ii) its organizational documents, except as required by the Bankruptcy Code or in a manner that is not materially adverse to the interests of the DIP ABL Secured Parties without the prior written consent of the DIP ABL Agent;

(vi) pay pre-petition liabilities, except as expressly provided for pursuant to "first day" or other orders entered upon pleadings in form and substance satisfactory to the DIP ABL Agent;

(vii) assert any right of subrogation or contribution against any other Loan Parties until all borrowings under the DIP ABL Credit Facility are paid in full and the DIP ABL Commitments are terminated;

(viii) make any acquisition or investment, pay any dividend or distribution, or make any debt prepayment, in each case, except as consistent with the Approved DIP Budget; and

(ix) form or acquire any subsidiary without the prior written consent of the DIP ABL Agent.

AGENT'S ADVISOR:    The DIP ABL Agent may retain (directly or through counsel), for the benefit of the DIP ABL Secured Parties, its affiliate Tower Hill Advisory Services, LLC ("***Tower Hill***") or another financial advisor or consultant

(the "***Agent's Advisor***") to provide advice, analysis and reporting with respect to such matters relating to the Borrower as the DIP ABL Agent may determine in its sole discretion. All costs, fees and expenses incurred by the DIP ABL Agent on account of such Agent's Advisor, whether incurred pre-petition or post-petition, shall be expenses payable by the Borrower promptly upon written demand. The Agent's Advisor shall constitute an indemnitee under this Term Sheet and under the DIP ABL Credit Facility Documentation.

**DEBTOR'S ADVISORS**: The Borrower will continue to retain (i) KCP Advisory Group LLC (the "***Financial Advisor***") to assist with the achievement of Required Milestones, strategic alternatives, financial analysis, financial reporting, and covenant compliance reporting (and shall continue to engage Jacen Dinoff as the Borrower's Chief Restructuring Officer), and (ii) RCS Real Estate Advisors (together with the Financial Advisor, collectively, the "***Debtor's Advisors***") to assist with renegotiating the Borrower's leases. The Loan Parties, the Debtor's Advisors all of their affiliates and related parties will cooperate with the DIP ABL Agent and the Agent's Advisor in all material respects and provide all information that the Agent's Advisor may request in a timely manner, subject to customary exclusions for confidentiality and/or privilege.

**EVENTS OF DEFAULT:** Usual and customary events of default for debtor-in-possession credit facilities of this size, type and purpose, which shall be acceptable to the DIP ABL Agent, including, without limitation: (i) failure of any Loan Party to pay any amount when and as required to be paid; (ii) any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party in the DIP ABL Credit Facility Documentation or in any document delivered by or on behalf of the Borrower or any other Loan Party in connection with the DIP ABL Credit Facility shall be incorrect or misleading in any material respect when made or deemed made; (iii) any post-petition judgment in excess of $50,000 (that is not contemplated in the Approved DIP Budget) or which would operate to divest the Loan Parties of any material assets; (iv) any breach or failure to comply with the terms of the Applicable DIP Order; (v) any breach or failure to comply with the terms of this Term Sheet or the DIP ABL Credit Facility Documentation; (vi) the Borrower being enjoined from conducting any material portion of its business; (vii) disruption of material business operations of the Borrower; (viii) material damage to or loss of material assets (to the extent not covered by insurance); (ix) conversion of the Case to a case under Chapter 7 of the Bankruptcy Code, or the removal of the Case from Subchapter V; (x) the appointment of a receiver, receiver and manager, interim receiver or similar official over all or any substantial portion of the assets of any Loan Party; (xi) the commencement of any winding up or liquidation proceeding under any other applicable law; (xii) the dismissal of the Case; (xiii) the appointment in the Case of a Chapter 11 trustee or an examiner with expanded powers (other than the Subchapter V trustee appointed in accordance with Section 1183 of the Bankruptcy Code); (xiv) the grant of any super priority administrative expense claim or any lien or charge

which is *pari passu* with or senior to those of the DIP ABL Secured Parties; (xv) any payment of pre-petition liabilities other than as provided in this Term Sheet and other than (a) payments under customary first day orders ("***First Day Orders***") consistent with the Approved DIP Budget, and (b) payments that are acceptable to the DIP ABL Agent and approved by the Bankruptcy Court; (xvi) failure of the Borrower to use the proceeds of the DIP ABL Credit Facility consistent with the Approved DIP Budget (subject to the Permitted Variances); (xvii) the Bankruptcy Court's entry of an order granting relief from the automatic stay to permit foreclosure of security interests in assets of the Borrower; (xviii) the Bankruptcy Court's entry of an order terminating exclusivity having been entered (or requested by the Borrower); (xix) any stay, reversal, revocation or modification of such order, or any other order of the Bankruptcy Court with respect to the Case that materially affects the DIP ABL Credit Facility, without the prior written consent of the DIP ABL Agent; and (xx) any order having been entered or granted (or requested by the Borrower) by either the Bankruptcy Court or any other court of competent jurisdiction materially adversely impacting the rights and interests of the DIP ABL Secured Parties, without the prior written consent of the DIP ABL Agent.

**REMEDIES:**   Immediately upon the occurrence and during the continuation of an event of default, subject to the Applicable DIP Order, (a) the DIP ABL Agent may declare (i) all DIP ABL Facility Obligations to be immediately due and payable, (ii) the termination, reduction or restriction of any further commitment to extend credit to the Borrower to the extent any such commitment remains, (iii) the termination of the DIP ABL Credit Facility and any DIP ABL Credit Facility Documentation as to any future liability or obligation of the DIP ABL Agent and the DIP ABL Lenders, but without affecting any of the liens of the DIP ABL Agent or the DIP ABL Facility Obligations and (iv) that the application of the Carve Out has occurred through the delivery of a Carve Out Trigger Notice (as defined in the Applicable DIP Order); and (b) the DIP ABL Agent may declare a termination, reduction or restriction on the ability of the Loan Parties to use any cash Collateral derived solely from the proceeds of Collateral (other than, during the Remedies Notice Period (as defined below), cash Collateral for payroll and other expenses that the DIP ABL Agent approves as critical to keep the business of the Borrower operating consistent with the Approved DIP Budget). Any of the foregoing declarations shall be made to the Loan Parties, the official committee(s) of creditors of the Borrower (if any) and the United States trustee or Subchapter V trustee (as applicable), and shall be referred to herein as a "***Termination Declaration***", and the date of any such Termination Declaration being herein referred to as the "***Termination Declaration Date***".

Five (5) business days following the Termination Declaration Date ("***Remedies Notice Period***"), in respect of the Collateral, the DIP ABL Agent shall have relief from the automatic stay in the Case and may set off against deposits and financial assets of the Loan Parties, foreclose on all or any portion of the Collateral, collect accounts receivable and apply

the proceeds thereof to the obligations, occupy the Loan Parties' premises to complete inventories, fulfill orders and sell inventories, execute going out-of-business sales or otherwise exercise remedies against the Collateral permitted by applicable non-bankruptcy law. During the Remedies Notice Period, the Borrower and any statutory committee shall be entitled to an emergency hearing before the Bankruptcy Court for the sole purpose of contesting whether an event of default has occurred. Unless during such period the Bankruptcy Court determines that an event of default has not occurred and/or is not continuing, the automatic stay, as to the DIP ABL Secured Parties, shall be automatically terminated at the end of such notice period and without further notice or order. During the Remedies Notice Period, the Loan Parties may not use cash Collateral except to pay payroll and other expenses approved by the DIP ABL Agent as critical to keeping the business of the Borrower operating consistent with the Approved DIP Budget.

In addition, if an event of default relating to non-payment, use of proceeds, cash management, inspections and appraisals, advisors or cooperation with advisors, the Budget Reporting Requirements, non-delivery of, or delivery of incorrect information in, a Borrowing Base Certificate, the DIP Budget Covenant or the Required Milestones occurs and is continuing, the DIP ABL Agent may direct the Borrower to: (w) within one (1) business day after the Remedies Notice Period expires, obtain from the Bankruptcy Court an order approving bid procedures for the sale of all or substantially all of the Collateral (the "*Sale*") and approving the stalking horse bidder consented to by the DIP ABL Agent with respect to the Sale, (x) within three (3) business days after the Remedies Notice Period expires, complete the auction for the Sale and declare a "successful bidder" for the Sale consented to by the DIP ABL Agent, (y) within five (5) business days after the Remedies Notice Period expires, obtain from the Bankruptcy Court a final order acceptable to the DIP ABL Agent approving the Sale, and (z) within seven (7) business days after the Remedies Notice Period expires, execute an agency agreement approved by the DIP ABL Agent in connection with the Sale and commence the Sale pursuant to the approved agency agreement and the applicable Bankruptcy Court sale orders.

In addition, the DIP ABL Agent and any liquidator (to the extent such liquidator has been engaged and has commenced a liquidation process) and engaged professionals will have the right to access and utilize, at no cost or expense, any trade names, trademarks, copyrights or other intellectual property and any warehouse, distribution centers, store or other locations the extent necessary or appropriate in order to sell, lease or otherwise dispose of any of the Collateral, including pursuant to any Bankruptcy Court approved sale process.

**ASSIGNMENTS AND PARTICIPATIONS:**     Usual and customary assignment and participation provisions for debtor-in-possession credit facilities of this size, type and purpose, which shall be acceptable to the DIP ABL Agent. Any DIP ABL Lender may at any

time assign all or a portion of its rights and obligations under the DIP ABL Credit Facility, *provided* that (i) no assignments may be made to any Loan Party or any affiliate or subsidiary of any Loan Party, any defaulting lender or any natural person, and (ii) assignments to any person other than a DIP ABL Lender or an affiliate or controlled fund of a DIP ABL Lender shall be subject to the consent of the DIP ABL Agent.  The Loan Parties may not assign all or any portion of their respective rights or obligations under the DIP ABL Credit Facility.

**WAIVERS AND AMENDMENTS:**

No amendment or waiver of any provision of the DIP ABL Credit Facility or the DIP ABL Credit Facility Documentation, and no consent to any departure by any Loan Party therefrom, shall be effective unless in writing signed by the DIP ABL Agent, with the consent of the DIP ABL Lenders, and the Borrower.

**EXPENSES AND INDEMNIFICATION; WAIVER OF CONSEQUENTIAL DAMAGES:**

The Borrower shall pay (a) all reasonable and documented out-of-pocket expenses incurred by the DIP ABL Agent and its affiliates (including, without limitation, Tower Hill) in connection with the DIP ABL Credit Facility, including, without limitation, (i) the reasonable fees, charges and disbursements of (A) counsel for the DIP ABL Agent, (B) outside consultants, advisors and other service providers to or for the Agent (including, without limitation, Tower Hill and its affiliates and any other professionals, consultants, appraisers, analysts, accountants and lawyers hired by the DIP ABL Agent), (C) appraisers, (D) commercial finance examiners, (E) insurance analysts or consultants, and (F) all such expenses incurred during any workout, restructuring or negotiations in respect of the DIP ABL Facility Obligations, and (ii) in connection with (A) the preparation, negotiation, management, execution and delivery of this Term Sheet or the DIP ABL Credit Facility Documentation or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (B) the administration of the DIP ABL Credit Facility, and (C) the enforcement or protection of the rights of the DIP ABL Secured Parties in connection with the DIP ABL Credit Facility or efforts to monitor, preserve, protect, collect, or enforce rights with respect to the Collateral; (b) all reasonable fees and charges (as adjusted from time to time) of the DIP ABL Agent with respect to access to online DIP ABL Loan information, the disbursement of funds (or the receipt of funds) to or for the account of the Borrower (whether by wire transfer or otherwise), together with any out-of-pocket costs and expenses incurred in connection therewith; (c) all costs related to the hedging of any exposure to foreign currency fluctuations or the conversion of foreign currency to Dollars; and (d) upon the occurrence and during the continuance of an event of default, all reasonable and documented out-of-pocket expenses incurred by the DIP ABL Secured Parties who are not the DIP ABL Agent or any affiliate incurred by any of them in connection with any of the DIP ABL Credit Facility; *provided* that such DIP ABL Secured Parties shall be entitled to reimbursement for no more than one counsel representing all such DIP ABL Secured Parties (absent

a conflict of interest in which case the DIP ABL Secured Parties may engage and be reimbursed for additional counsel).

The Loan Parties shall indemnify the DIP ABL Agent (and any sub-agent thereof), each other DIP ABL Secured Party and, with respect to each of the foregoing persons, such person's affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors and representatives of such person and of such person's affiliates (collectively, "***Related Parties***") (each, an "***Indemnitee***") against, and hold each Indemnitee harmless (on an after tax basis) from, any and all losses, claims, causes of action, damages, liabilities, settlement payments, reasonable costs, and related reasonable expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the DIP ABL Credit Facility or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, or, in the case of the DIP ABL Agent (and any sub-agents thereof) and their Related Parties only, the administration of the DIP ABL Credit Facility, (ii) any DIP ABL Loans or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of hazardous materials on or from any property owned or operated by any Loan Party or any of its subsidiaries, or any environmental liability related in any way to any Loan Party or any of its subsidiaries, (iv) any claims of, or amounts paid by any DIP ABL Secured Party to, a depository bank or other person which has entered into a control agreement with any DIP ABL Secured Party hereunder in connection with the DIP ABL Credit Facility or any agreement or instrument contemplated hereby or thereby, or (v) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party or any of the Loan Parties' Related Parties or creditors, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted from the gross negligence, willful misconduct, fraud or bad faith of such Indemnitee, or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any DIP ABL Credit Facility Documentation, if the Borrower or such Loan Party has obtained a final and non-appealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

To the fullest extent permitted by applicable law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, the DIP ABL Credit Facility or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any DIP ABL Loan or the use of the proceeds thereof. No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems in connection with the DIP ABL Credit Facility or the transactions contemplated hereby or thereby other than for direct or actual damages resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final and non-appealable judgment of a court of competent jurisdiction.

**GOVERNING LAW:**     State of New York.

**PRICING/FEES/EXPENSES:**     As set forth in <u>Addendum I</u>.

**COUNSEL TO THE DIP ABL AGENT:**     Choate, Hall & Stewart LLP.

**OTHER:**     Each of the parties shall (i) waive its right to a trial by jury and (ii) submit to New York jurisdiction. The Loan Parties shall agree not to bring any suit or action in respect of or related to the DIP ABL Credit Facility or any documentation therefor in any forum, other than in the Bankruptcy Court and in courts of the state of New York sitting in New York county and of the United States District Court of the Southern District of New York.

[Signatures Follow]

IN WITNESS WHEREOF, the parties hereto hereby agree to be bound by the terms and conditions set forth in this Term Sheet, and have caused this Term Sheet to be duly executed and delivered by their duly authorized officers as of the date first written above.

**SOLSTICE MARKETING CONCEPTS LLC**

By: _____
Name:
Title:

**FAIRWAY LLC**

By: _____
Name:
Title:

**SECOND AVENUE CAPITAL PARTNERS**

By: _____
Name:
Title:

**PRICING AND FEES**

**INTEREST RATES:** The DIP ABL Loans shall accrue interest at a rate per annum equal to three (3) month LIBOR (as determined on the first business day of each month) plus 10.00%, subject to a LIBOR floor of 1.75%.

Interest accrued on the DIP ABL Facility Obligations shall be due and payable in arrears on the first business day of each month.

During the continuance of any event of default under the DIP ABL Credit Agreement, the interest rate per annum on obligations owing under the DIP ABL Credit Agreement shall increase by 300 basis points.

**UNUSED LINE FEE:** Commencing on the Closing Date, an unused line fee of 0.75% per annum shall be payable on the actual daily unused portions of the DIP ABL Commitments. Such fee shall be payable in arrears on the first business day of each month, commencing on the first monthly payment date to occur after the Closing Date.

**CALCULATION OF INTEREST AND FEES:** Other than calculations in respect of base rate loans (which shall be made on the basis of actual number of days elapsed in a 365/366 day year), all calculations of interest and fees shall be made on the basis of actual number of days elapsed in a 360 day year.

**MONITORING FEE:** A nonrefundable monitoring fee equal to $4,500 per month shall be fully earned, and due and payable in full to the DIP ABL Agent (for its own account), in advance on the Closing Date and the same day of each month thereafter prior to the payment in full of the DIP ABL Credit Facility and the termination of the DIP ABL Commitments.

**AGENT'S ADVISOR FEE:** A nonrefundable Agent's Advisor fee equal to $4,500 per month shall be fully earned, and due and payable in full to the DIP ABL Agent (for the account of the Agent's Advisor) or directly to the Agent's Advisor, as directed by the DIP ABL Agent, in advance on the Closing Date and the same day of each month thereafter prior to the payment in full of the DIP ABL Credit Facility and the termination of the DIP ABL Commitments.

**CLOSING FEE:** A nonrefundable closing fee equal to $260,000 shall be fully earned, and due and payable in full to Second Avenue, on the Closing Date.

**EXIT FEE:** A nonrefundable exit fee (the "***Exit Fee***") equal to $400,000 shall be fully earned on the Closing Date and due and payable in full to Second Avenue on the earlier to occur of (i) the payment in full of the DIP ABL Credit Facility and the termination of the DIP ABL Commitments and (ii) the Maturity Date; *provided* that the amount of such Exit Fee shall be reduced from $400,000 to $125,000 if Second Avenue provides exit financing to the Borrower upon the Borrower's emergence from the Case. Any such reduced Exit Fee shall remain fully earned on the

Closing Date, but shall be payable in two installments: the first installment of 50% or $62,500 shall be paid on the first anniversary of the exit financing and the second installment of $62,500 shall be paid on the second anniversary of the exit financing (or, with respect to both such installments, if earlier, the date upon which (x) such exit financing is repaid and the commitments thereunder are terminated, (y) such exit financing is accelerated, or (z) at the DIP ABL Agent's election, an event of default occurs under such exit financing).

## ADDENDUM II

## MILESTONES

The Borrower shall achieve the following milestones (as the same may be extended from time to time with the consent of the DIP ABL Agent in its sole discretion, each, a "***Required Milestone***" and collectively, the "***Required Milestones***"), in each case (as applicable) on terms and conditions, and subject to documentation in form and substance, acceptable to the DIP ABL Agent in all respects:

1. On or before the date that is 10 business days after the date upon which the Bankruptcy Court enters the Interim DIP Order, the Loan Parties shall have entered into the DIP ABL Credit Facility Documentation.

2. On or before the date that is 10 days after the date upon which the Bankruptcy Court enters the Interim DIP Order, the Borrower shall have filed a motion requesting, and within 25 days after the date such motion was filed shall have obtained, an order of the Bankruptcy Court extending the lease assumption/rejection period such that the lease assumption/rejection period shall be 210 days.

3. On or before the date that is 30 days after the date upon which the Bankruptcy Court enters the Interim DIP Order, the Bankruptcy Court shall have entered an order authorizing and approving the DIP Senior Credit Facility on a final basis (the "***Final DIP Order***").

4. On or before March 15, 2021, the Borrower shall have filed a Chapter 11 (Subchapter V) plan of reorganization (and, if required by the Bankruptcy Court, a disclosure statement relating to such plan), which plan shall provide for indefeasible payment in full in cash of the DIP ABL Facility Obligations on the effective date of such plan, which plan may (in the DIP ABL Agent's sole discretion) contemplate a conversion of the DIP ABL Facility to an exit facility (any such plan that satisfies the foregoing and other terms and conditions acceptable to the DIP ABL Agent, an "***Acceptable Plan***").

5. On or before March 15, 2021, the Borrower shall have delivered to the DIP ABL Agent a plan for emergence, in cash flow format, for at least the 26 weeks following emergence. Thereafter, the Borrower shall deliver to the DIP ABL Agent copies of any updates to such forecast as and when such updates are submitted to the Bankruptcy Court.

6. On or before March 20, 2021, the Borrower shall have entered into written term sheets (which shall be binding) documenting agreements regarding rent obligations obtained with the landlords for its leased premises (other than those premises with respect to which the Borrower has filed a motion with the Bankruptcy Court to reject the applicable lease), in each case, consistent with the Approved DIP Budget then in effect.

7. On or before April 10, 2021, the Bankruptcy Court shall have entered an order authorizing and approving the voting and solicitation procedures (and, if required by the Bankruptcy Court, the disclosure statement) for an Acceptable Plan.

8. On or before May 1, 2021, the Borrower shall have obtained a new inventory appraisal from an appraiser acceptable to, and engaged by, the DIP ABL Agent, which appraisal shall provide for a net orderly liquidation value at least equal to 61% (expressed as a percentage of cost and calculated as an average of all such net orderly liquidation values provided for in such appraisal, across all months and all types and categories of inventory).

9. On or before May 20, 2021, the Bankruptcy Court shall have entered an order confirming an Acceptable Plan, and the DIP ABL Agent shall be satisfied (which may, without limitation, to the extent applicable to the consummation thereof, include evidence of committed financing) that such Acceptable Plan is reasonably likely to be consummated on or prior to June 1, 2021.

10. On or before June 5, 2021, the effective date of the Acceptable Plan shall have occurred in accordance with its terms, the DIP ABL Facility Obligations shall have been indefeasibly paid in full in cash, and the Borrower shall have emerged from the Case.

The Loan Parties shall provide the DIP ABL Agent with any information or materials reasonably requested by the DIP ABL Agent in connection with the Borrower's progress on achieving any Required Milestone.

## ADDENDUM III

## CONDITIONS PRECEDENT

1. **Interim DIP Order/Bankruptcy Matters**

   (a) The Case shall have been commenced in the Bankruptcy Court, and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Case or shortly thereafter shall have been reviewed in advance by the DIP ABL Agent and shall be acceptable in form and substance to the DIP ABL Agent.

   (b) The Bankruptcy Court shall have entered, upon motion in form and substance acceptable to the DIP ABL Agent, an interim order approving and authorizing the DIP ABL Credit Facility, all provisions thereof and the priorities and liens granted under Bankruptcy Code Section 364(c) and (d), as applicable, in form and substance acceptable to the DIP ABL Agent (the "***Interim DIP Order***").

   (c) The Interim DIP Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, that is materially adverse to the interests of the DIP ABL Secured Parties, without the prior written consent of the DIP ABL Agent.

   (d) The Borrower shall be in compliance in all respects with the Interim DIP Order.

   (e) Each other Required Milestone that is required to be complied with on or prior to the Closing Date shall have been complied with.

   (f) No trustee or examiner with enlarged powers (beyond those set forth in Section 1183 of the Bankruptcy Code) shall have been appointed with respect to the Borrower or its property.

   (g) A cash management order acceptable to the DIP ABL Agent shall be in full force and effect.

   (h) The DIP ABL Agent shall have a fully perfected, first-priority lien on the Collateral.

2. **Financial Statements, Budgets and Reports**

   (a) The DIP ABL Agent shall have received and approved the Initial DIP Budget, and such other information (financial or otherwise) as may be requested by the DIP ABL Agent shall be acceptable in form and substance to the DIP ABL Agent.

   (b) The DIP ABL Agent shall have received a Borrowing Base Certificate relating to the most recent calendar week ended prior to the Closing Date (calculated as of the close of business of the Saturday of such week), in form and substance satisfactory to the DIP ABL Agent, and the DIP ABL Agent shall be satisfied that (i) after giving effect to all borrowings to be made on the Closing Date, Excess Availability (for the avoidance of doubt, after giving effect to the Availability Block and all Reserves) shall not be less than $1,500,000, and (ii) the Borrowing Base (for the avoidance of doubt, after giving effect to the Availability Block and all Reserves) shall not be less than $3,000,000.

3. **Performance of Obligations**

(a) The DIP ABL Agent shall have received payment by the Borrower of all reasonable fees that are due and payable on or prior to the Closing Date in connection with the transactions contemplated hereby, and the Borrower shall have paid all reasonable and documented out-of-pocket expenses (and reasonable estimates therefor) of the DIP ABL Secured Parties that are invoiced prior to the Closing Date in connection with the transactions contemplated hereby.

(b) No default or event of default shall have occurred under the DIP ABL Credit Facility.

(c) The representations and warranties under the DIP ABL Credit Facility shall be true and correct in all material respects.

(d) There shall have been (a) since the Petition Date, other than those customarily resulting from the commencement of the Case, no material adverse change, individually or in the aggregate, in the business, prospects, operations, property, assets, or condition, financial or otherwise, of the Borrower or the Collateral, (b) no litigation commenced which could reasonably be expected to have a material adverse impact on any Loan Party, or its business, or its ability to perform any material obligation or repay the loans, or which challenges the DIP ABL Credit Facility, (c) since the Petition Date, no material increase in the liabilities, liquidated or contingent, of any Loan Party, or material decrease in the assets of the Borrower, and (d) since the Petition Date, other than those resulting from the commencement of the Case, no material adverse change in the ability of the DIP ABL Secured Parties to enforce the DIP ABL Credit Facility Documentation, and the obligations of the Loan Parties thereunder.

(e) Upon entry of the Interim DIP Order, the entry into this Term Sheet shall not violate any requirement of law and shall not be enjoined, temporarily, preliminarily, or permanently.

4. **Customary Closing Documents**

(a) Satisfaction of customary closing conditions, including, without limitation, customary officer's closing certificates (including, without limitation, as to the satisfaction of closing conditions set forth herein); an updated perfection certificate; lien, judgment and litigation searches; corporate records and documents from public officials; organizational documents; customary evidence of authority, authorization, execution and delivery; good standing certificates; obtaining of any material third party and governmental consents necessary; "know your customer" and anti-money laundering rules and regulations, including the USA Patriot Act and beneficial ownership regulations.

(b) The DIP ABL Agent, the Loan Parties and G.S.I. Corp. shall have entered into a subordination agreement in form and substance acceptable to the DIP ABL Agent.

(c) The Borrower shall have delivered to the DIP ABL Agent a notice of borrowing in form and detail acceptable to the DIP ABL Agent, duly executed by the chief restructuring officer of the Borrower.

(d) The DIP ABL Agent shall have received duly executed Validity and Liquidation Support Agreements, in form and substance acceptable to the DIP ABL Agent, from each of Claudio Dotta, Nathan Rosenberg and Mikey Rosenberg.

**EXHIBIT A**

**INITIAL DIP BUDGET**

[**Attached as Exhibit 2 to the Interim Order**]

## EXHIBIT 2

**DIP Budget**

**Solstice Marketing Concepts LLC**
**13-Week Cash Flow Forecast (Budget)**

| Week# | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending | 2/27/21 | 3/6/21 | 3/13/21 | 3/20/21 | 3/27/21 | 4/3/21 | 4/10/21 | 4/17/21 | 4/24/21 | 5/1/21 | 5/8/21 | 5/15/21 | 5/22/21 |
|  | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Collections** | 212,298 | 168,739 | 336,460 | 277,493 | 336,460 | 277,493 | 298,629 | 246,292 | 298,629 | 246,292 | 459,276 | 378,784 | 459,276 |
| Other | | | | | | | | | | | | | |
| **Total Cash Available** | 212,298 | 168,739 | 336,460 | 277,493 | 336,460 | 277,493 | 298,629 | 246,292 | 298,629 | 246,292 | 459,276 | 378,784 | 459,276 |
| *Operating Disbursements* | | | | | | | | | | | | | |
| Merchandise purchases | - | 25,000 | 25,000 | 25,000 | 220,000 | 100,000 | 100,000 | 33,333 | 54,167 | 178,750 | 178,750 | 170,625 | 132,813 |
| Store Payroll | | 180,762 | | 180,762 | | 180,762 | | 180,762 | | 180,762 | | 180,762 | |
| Store Occupancy Costs | 5,000 | 164,105 | 574,367 | | | | 333,157 | | | 333,157 | | | |
| Store other | 20,000 | 20,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| Utilities | 20,000 | | | 20,000 | | | | 20,000 | | | | | 20,000 |
| Sales tax | | | 85,424 | | | | 124,872 | | | | | 138,539 | |
| Other taxes | | | | | 38,000 | | | | | | | | |
| Corp payroll | | 45,000 | | 45,000 | | 45,000 | | 45,000 | | 45,000 | | 45,000 | |
| Health insurance and benefits | | | | | 81,400 | | | | 81,400 | | | | 81,400 |
| Other corp expenses | 7,500 | 7,500 | 10,000 | 10,000 | 10,000 | 10,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 |
| **Total operating disbursements** | 52,500 | 442,367 | 724,792 | 310,762 | 379,400 | 365,762 | 603,028 | 324,095 | 180,567 | 782,669 | 223,750 | 579,926 | 279,213 |
| *Interest and Professional Fees* | | | | | | | | | | | | | |
| Lender Monitoring and Advisor Fees | | | 9,000 | | | | 9,000 | | | | 50,000 | 9,000 | |
| Interest | | 22,049 | | | | 21,835 | | | | | 31,971 | | ` |
| Legal | | | | | | | | | | | | | |
| Professional Fees | 10,000 | | | 10,000 | | | | 10,000 | | | | | 10,000 |
| **Total interest and professional fees** | 10,000 | 22,049 | 9,000 | 10,000 | - | 21,835 | 9,000 | 10,000 | - | - | 81,971 | 9,000 | 10,000 |
| *Reorganization Disbursements* | | | | | | | | | | | | | |
| Adequate Assurance Utilities Deposit | | | 25,000 | | | | | | | | | | |
| Closing stores payroll | 136,941 | 82,164 | 82,164 | 123,247 | 123,247 | | | | | | | | |
| Closing stores occupancy | 210,297 | | 266,573 | | | | | | | | | | |
| Closing stores other | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | | | | | | | |
| Pre-petition merchant AP debt payments | 89,877 | 89,877 | 89,877 | 89,877 | 89,877 | 89,877 | 89,877 | 89,877 | 89,877 | 89,877 | 89,877 | 89,877 | - |
| Pre-petition non-merchant AP debt payments | 71,003 | 52,891 | 40,129 | 12,763 | 12,763 | 12,763 | 33,748 | 6,381 | 3,561 | 3,561 | 3,561 | 30,928 | 3,561 |
| US Trustee fees | | | | | | | | 50,000 | | | | | |
| SubChapter V Trustee fees | | | | | | | | | - | | | 50,000 | |
| Legal fees | | | | | | | | | | | | | |
| Professional fees | | | | | | | | | | | | | |
| Carve Out Escrow | 250,000 | 100,000 | 100,000 | 50,000 | | | | | | | | | |
| Loan Origination & related closing costs | 260,000 | | | | | | | | | | | | |
| **Total reorganization disbursements** | 1,028,117 | 334,932 | 613,743 | 285,886 | 235,886 | 112,639 | 123,624 | 146,258 | 93,438 | 93,438 | 93,438 | 170,804 | 3,561 |
| **Total Disbursements** | 1,090,617 | 799,348 | 1,347,534 | 606,648 | 615,286 | 500,237 | 735,653 | 480,353 | 274,005 | 876,107 | 399,159 | 759,731 | 292,774 |
| **Net Cash** | (878,320) | (630,609) | (1,011,075) | (329,155) | (278,826) | (222,744) | (437,024) | (234,061) | 24,624 | (629,815) | 60,117 | (380,946) | 166,502 |
| **Beginning Cash** | $ 517,178 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |
| Collections | 212,298 | 168,739 | 336,460 | 277,493 | 336,460 | 277,493 | 298,629 | 246,292 | 298,629 | 246,292 | 459,276 | 378,784 | 459,276 |
| Disbursements | (1,090,617) | (799,348) | (1,347,534) | (606,648) | (615,286) | (500,237) | (735,653) | (480,353) | (274,005) | (876,107) | (399,159) | (759,731) | (292,774) |
| Advances | 461,142 | 630,609 | 1,011,075 | 329,155 | 278,826 | 222,744 | 437,024 | 234,061 | (24,624) | 629,815 | (60,117) | 380,946 | (166,502) |
| **Cash Balance Ending** | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 | $ 100,000 |

**Solstice Marketing Concepts LLC**
**13-Week Cash Flow Forecast (Budget)**

| | Week# | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Week Ending | 2/27/21 | 3/6/21 | 3/13/21 | 3/20/21 | 3/27/21 | 4/3/21 | 4/10/21 | 4/17/21 | 4/24/21 | 5/1/21 | 5/8/21 | 5/15/21 | 5/22/21 |
| | | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast |
| **Line of Credit** | | | | | | | | | | | | | | |
| Beginning | | $ - | $ 461,142 | $ 1,091,751 | $ 2,102,825 | $ 2,431,980 | $ 2,710,806 | $ 2,933,550 | $ 3,370,574 | $ 3,604,635 | $ 3,580,011 | $ 4,209,826 | $ 4,149,708 | $ 4,530,655 |
| Add: Disbursements | | 1,090,617 | 799,348 | 1,347,534 | 606,648 | 615,286 | 500,237 | 735,653 | 480,353 | 274,005 | 876,107 | 399,159 | 759,731 | 292,774 |
| Less: Collections | | (212,298) | (168,739) | (336,460) | (277,493) | (336,460) | (277,493) | (298,629) | (246,292) | (298,629) | (246,292) | (459,276) | (378,784) | (459,276) |
| Other | | (417,178) | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Advance** | | 461,142 | 630,609 | 1,011,075 | 329,155 | 278,826 | 222,744 | 437,024 | 234,061 | (24,624) | 629,815 | (60,117) | 380,946 | (166,502) |
| Ending | | $ 461,142 | $ 1,091,751 | $ 2,102,825 | $ 2,431,980 | $ 2,710,806 | $ 2,933,550 | $ 3,370,574 | $ 3,604,635 | $ 3,580,011 | $ 4,209,826 | $ 4,149,708 | $ 4,530,655 | $ 4,364,153 |
| **Credit Card Receivable** | | | | | | | | | | | | | | |
| Beginning | | 61,487 | 39,021 | 60,113 | 35,833 | 70,519 | 46,239 | 80,925 | 59,375 | 90,161 | 68,611 | 99,397 | 66,254 | 113,602 |
| Add Sales | | 210,924 | 210,924 | 346,866 | 346,866 | 346,866 | 346,866 | 307,865 | 307,865 | 307,865 | 307,865 | 473,480 | 473,480 | 473,480 |
| Less Collections | | (222,844) | (179,285) | (353,803) | (294,836) | (353,803) | (294,836) | (314,022) | (261,685) | (314,022) | (261,685) | (482,950) | (402,458) | (482,950) |
| Adjustment/Fees | | (10,546) | (10,546) | (17,343) | (17,343) | (17,343) | (17,343) | (15,393) | (15,393) | (15,393) | (15,393) | (23,674) | (23,674) | (23,674) |
| Ending | | 39,021 | 60,113 | 35,833 | 70,519 | 46,239 | 80,925 | 59,375 | 90,161 | 68,611 | 99,397 | 66,254 | 113,602 | 80,458 |
| **Merchandise Inventory** | | | | | | | | | | | | | | |
| Stock Ledger Inventory, Beginning | | 10,680,837 | 10,575,270 | 10,689,702 | 10,616,096 | 10,542,490 | 10,468,883 | 10,457,777 | 10,466,344 | 10,474,912 | 10,483,480 | 10,435,797 | 10,305,496 | 10,311,613 |
| Cost of Sales - Unadjusted | | (105,567) | (105,567) | (173,606) | (173,606) | (173,606) | (173,606) | (153,932) | (153,932) | (153,932) | (153,932) | (236,551) | (236,740) | (236,740) |
| Inventory Purchases | | | 220,000 | 100,000 | 100,000 | 100,000 | 162,500 | 162,500 | 162,500 | 162,500 | 106,250 | 106,250 | 242,857 | 283,333 |
| Other: Returns, adjustments, etc | | | | | | | | | | | | | | |
| Stock Ledger Inventory, Ending | | 10,575,270 | 10,689,702 | 10,616,096 | 10,542,490 | 10,468,883 | 10,457,777 | 10,466,344 | 10,474,912 | 10,483,480 | 10,435,797 | 10,305,496 | 10,311,613 | 10,358,207 |
| **BORROWING BASE** | | | | | | | | | | | | | | |
| Credit Card Receivables | | 39,021 | 60,113 | 35,833 | 70,519 | 46,239 | 80,925 | 59,375 | 90,161 | 68,611 | 99,397 | 66,254 | 113,602 | 80,458 |
| @ Advance rate 95% | | 37,070 | 57,108 | 34,041 | 66,993 | 43,927 | 76,879 | 56,406 | 85,653 | 65,180 | 94,427 | 62,941 | 107,921 | 76,435 |
| Ending Stock Ledger Inventory | | 10,575,270 | 10,689,702 | 10,616,096 | 10,542,490 | 10,468,883 | 10,457,777 | 10,466,344 | 10,474,912 | 10,483,480 | 10,435,797 | 10,305,496 | 10,311,613 | 10,358,207 |
| Less: Ineligibles (est @ 3.5%) | | (370,134) | (374,140) | (371,563) | (368,987) | (366,411) | (366,022) | (366,322) | (366,622) | (366,922) | (365,253) | (360,692) | (360,906) | (362,537) |
| Less: Closed Store Inventory | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Less: Other | | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Eligible Inventory | | 10,205,135 | 10,315,563 | 10,244,533 | 10,173,503 | 10,102,472 | 10,091,755 | 10,100,022 | 10,108,290 | 10,116,558 | 10,070,544 | 9,944,804 | 9,950,707 | 9,995,669 |
| NOLV | | 46% | 46% | 46% | 46% | 46% | 46% | 46% | 46% | 46% | 64% | 64% | 64% | 64% |
| 95% of NOLV | | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 44% | 61% | 61% | 61% | 61% |
| Borrowing Availability from Inventory | | 4,459,644 | 4,507,901 | 4,476,861 | 4,445,821 | 4,414,780 | 4,410,097 | 4,413,710 | 4,417,323 | 4,420,936 | 6,113,324 | 6,036,993 | 6,040,577 | 6,067,871 |
| Total Borrowing Base (AR + Inventory) | | $ 4,496,714 | $ 4,565,009 | $ 4,510,902 | $ 4,512,814 | $ 4,458,707 | $ 4,486,976 | $ 4,470,116 | $ 4,502,976 | $ 4,486,116 | $ 6,207,751 | $ 6,099,934 | $ 6,148,498 | $ 6,144,306 |
| Less: Professional Fee Block | | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) | (150,000) |
| Less: Availability Block | | (700,000) | (700,000) | (700,000) | (700,000) | (700,000) | (700,000) | (700,000) | (700,000) | (700,000) | (700,000) | (700,000) | (700,000) | (700,000) |
| Less: Lease assumption reserve | | | | | | | | | | | | | | |
| Less: Loan Balance | | (461,142) | (1,091,751) | (2,102,825) | (2,431,980) | (2,710,806) | (2,933,550) | (3,370,574) | (3,604,635) | (3,580,011) | (4,209,826) | (4,149,708) | (4,530,655) | (4,364,153) |
| Net Available/(Deficit) | | $ 3,185,573 | $ 2,623,258 | $ 1,558,076 | $ 1,230,833 | $ 897,901 | $ 703,426 | $ 249,542 | $ 48,341 | $ 56,105 | $ 1,147,925 | $ 1,100,226 | $ 767,843 | $ 930,153 |

**Notes**

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sales (Net of Tax, prior to credit card fees) | | 210,924 | 210,924 | 346,866 | 346,866 | 346,866 | 346,866 | 307,865 | 307,865 | 307,865 | 307,865 | 473,480 | 473,480 | 473,480 |
| COGS | | (105,567) | (105,567) | (173,606) | (173,606) | (173,606) | (173,606) | (153,932) | (153,932) | (153,932) | (153,932) | (236,551) | (236,740) | (236,740) |
| Gross Profit | | 105,356 | 105,356 | 173,260 | 173,260 | 173,260 | 173,260 | 153,932 | 153,932 | 153,932 | 153,932 | 236,930 | 236,740 | 236,740 |
| Gross Profit % | | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% | 50.0% |

There is an additional $150,000 Supplemental Case Professional Carve Out that may become available for Case Professionals pursuant to the terms of the Interim Order

## EXHIBIT 3

**GSI Subordination Agreement**

**[To be Provided]**